BOWRING et al v. THEBAUD et al.

(Circuit Court of Appeals, Second Circuit. December 6, 1892.)

No. 2.

1. SHIPPING—WARRANTY OF SEAWORTHINESS—CHARTER STIPULATION.
    The implied warranty of seaworthiness extends to the time when the vessel actually breaks ground for the voyage, and not merely to the time, when she begins to take in cargo; and this implied warranty is not in any way varied by an express warranty in the charter that the vessel shall be staunch, strong, etc., "for such voyage," namely, the contemplated voyage "from New York to Progreso, [Mexico,] and back again to New York or Boston;" nor is it varied by a further stipulation that, if the vessel shall be required to go from one one dock to another while loading the charterers shall pay towage. Hence there was a breach of the warranty where the vessel was pierced by an unknown obstruction while receiving cargo at a dock to which she had been removed, and the owners were solely liable for a resulting injury to part of the cargo, and there was no case for a general average.

2. SAME—EXCEPTIONS IN CHARTER PARTY.
    The exception in a charter party as to dangers of seas and navigation is not applicable to a hidden danger which, by injuring the vessel at her receiving dock, works a breach of the warranty of seaworthiness.

3. SAME—GENERAL AVERAGE BOND—CONSTRUCTION.
    A vessel was injured at her dock at New York while loading, and one of her compartments was flooded. She was docked and repaired without unloading, the owners of the cargo giving a bond, whereby, after reciting that certain expenses were incurred thereby, they covenanted to pay th "loss and damage aforesaid, and such other incidental expenses thereon as shall be made to appear to be due from us as owners, consignees, or shippers of cargo, * * * according to our interest therein, or responsibility therefor;" and that "such losses and expenses be stated and apportioned in accordance with the established usages and laws of this state in similar cases." *Held*, that this bond merely covered any possible liability of the obligors for a general average contribution, and, there being no case for general average, there was no liability in the bond.

Appeal from the Circuit Court of the United States for the Southern District of New York.

In Admiralty. Libel by Thomas B. Bowring and Nicholas S. Stabb against Edward V. Thebaud, Paul L. Thebaud, Dolphin E. Thebaud, and Frank E. Thebaud to recover an assessment on a general average bond. In the district court a decree was entered for respondents, (42 Fed. Rep. 795,) which was affirmed on appeal to the circuit court. Libelants appeal. Affirmed

Convers & Kirlin, for appellants.
Carter & Ledyard, for appellees.

Before WALLACE, SHIPMAN, and LACOMBE, Circuit Judges.

WALLACE, Circuit Judge. The libel in this cause is founded on a bond executed to the libelants by the respondents under the following circumstances: On the 29th day of June, 1885, pursuant to a proposition in writing, made by the respondents to the libelants to charter of the libelants the steamship Thorn Holme, then lying at Watson's stores, in the port of New York, "for a voyage from New York to Progreso, [Mexico,] and back to New York or Boston," a charter party was executed between the parties. By its terms the libelants "agree in the freighting and chartering of the whole of the said vessel (with the exception of the cabin and bunkers and necessary room for the crew, and storage of provisions, sails, and cables) unto said party of the second part for the voyage from New York to Progreso, Mexico, and back from Progreso to New York or Boston; the vessel to take such cargo to and from the dock at Progreso, as practicable, on the terms following: The said vessel shall be tight, staunch, and strong, and every way fitted for such a voyage, and receive on board during the aforesaid voyage the merchandise hereinafter mentioned." The instrument then describes the cargo to be carried, the sum to be paid for the use of the vessel, and provides for various details to which reference is unnecessary. It then proceeds as follows: "It is agreed that the lay days for loading the vessel shall be as follows: * * * For each day's detention by the fault of the said party of the second part, 35 sterling per day, day by day, shall be paid by the said party of the second part to the said party of the first part. The cargo or cargoes to be received and delivered alongside within reach of the vessel's tackles. Vessel to haul once to New York to such loading berth as charterers may designate, and, if again required to move, charterers to pay towage; and to discharge homeward cargo at such berth as charterers may designate; vessel to employ charterers' stevedore loading at New York. The danger of the seas and navigation of every nature and kind always mutually excepted." July 3, 1885, pursuant to directions from the charterers, the vessel was hauled from Watson's stores to Union stores, near by in the harbor, and began to load a cargo. After the greater part of the cargo had been taken on board, and on July 10th, it was discovered that the vessel was leaking badly in the fore peak, owing, as subsequently appeared, to a hole in the bow, made by some unknown cause while

she was lying at Union stores. The fore peak was separated from the rest of the vessel by a collision bulkhead. Attempts to free the vessel by pumping having failed, the sluiceway into the fore peak was closed, and the water was thus confined within the fore peak. Surveys upon the vessel were thereupon held, and the master, pursuant to the recommendations of the surveys, decided that it was necessary to put the vessel on the dry dock. After consultation with the underwriters, and in order to save expense, he concluded to dock her with the cargo on board. Repairs were made by riveting a patch over the hole, and on the 18th of July the loading was completed, and the vessel was ready to sail upon her voyage. On that day the bond in suit was executed. The instrument, after reciting the accident to the vessel, and her having been docked with the cargo in her, by which means losses and expenses had been incurred, contained a covenant by the respondents to the libelants to pay "the loss and damage aforesaid, and such other incidental expenses thereon as shall be made to appear to be due from us as owners, consignees, or shippers of cargo, * * * according to our interest therein, or responsibility therefor," and that "such losses and expenses be stated and apportioned in accordance with the established usages and laws of this state in similar cases, by Jacob R. Telfair, or other competent adjusters of marine losses." Subsequently an adjustment was made under Mr. Telfair's direction, by which the cargo was assessed, for general average, $816.05. By the libel this sum is claimed to be due from the respondents as a general average charge.

We are of the opinion that this cause does not present any ground for an average contribution from the respondents, because it was obligatory on the libelants, under the covenant for seaworthiness, to have the vessel in proper condition for her voyage at the time of breaking ground. The shipowner in every contract of affreightment impliedly engages with the shipper of goods that his ship on the commencement of her voyage is seaworthy for that voyage, and supplied with a competent crew. The doctrine is stated in Carver, Carriage by Sea, (2d Ed.) § 21, as follows:

"The warranty of seaworthiness for a voyage must be satisfied at the time of sailing with the cargo. It is not sufficient that the ship was fit for the voyage while the cargo was being taken in, if she became unfit before she started. The warranty in truth appears to be a double one, viz. that the ship shall be fit to receive the cargo when receiving it, and shall be fit to sail at the time of sailing."

As stated by Lord Mansfield in Bermon v. Woodbridge, 2 Doug. 781, 788, the warranty is that the ship shall be seaworthy "when she first sails on the voyage." The question whether such a warranty is satisfied if the vessel is seaworthy at the time of being laden, but not at the time of breaking ground for her voyage, has been considered in several adjudged cases. In Purvis v. Tunno, 2 Bay, 492, the defendants had chartered a brig for a voyage from Charleston to Cowes and a market. After part of the cargo had been put on board of her, and while she lay at the wharf, she grounded, and thereby started some of her planks, and became so leaky

that the cargo had to be landed, and she was then put into the hands of a ship carpenter for repairs. The freighters, conceiving that they had a right to abandon their contract, and were not obliged to wait until she was repaired, chartered another vessel, and sent the cargo forward. In a suit upon the contract of affreightment it was contended for the plaintiff that the defendant should have waited a reasonable time until the ship was repaired, and for the defendants it was contended that it was obligatory on the part of the owners, not only that the ship should be fit for sea before any part of the cargo was put on board, but also that she should be in like good order until she broke ground to proceed on her voyage, and that they were not obliged to wait until the ship was again made seaworthy, and lose the chance of procuring another vessel without delay to send on their merchandise. The court sustained the position of the defendants. In Cohn v. Davidson, 2 Q. B. Div. 455, in the opinion the discussion turned upon the point at which the warranty of seaworthiness on the part of the vessel was fulfilled, it being contended by the defendant that she was seaworthy when she commenced taking in cargo, and must have received damage in the course of loading, and that such seaworthiness satisfied the warranty. On the other side, it was contended that the warranty of seaworthiness on the part of the vessel continues in full force up to the time of sailing or breaking ground for her voyage. The latter view was adopted by the court. Mr. Justice Field said:

"Seaworthiness is well understood to mean that measure of fitness which the particular voyage or particular stage of the voyage requires. A vessel seaworthy for port, and even for loading in port, may be, without breach of warranty, whilst in port, unseaworthy for the voyage, (Annen v. Woodman, 3 Taunt. 299;) but if she put to sea in that state the warranty is broken. Now, the degree of seaworthiness which the merchant requires is seaworthiness for the voyage; and surely the most natural period at which the warranty is to attach is that at which the perils are to be encountered which the ship is to be worthy to meet."

In the case of The Eugene Vesta, 28 Fed. Rep. 762, decided by the present Mr. Justice Brown of the supreme court, the court said:

"There can be no doubt that there is an implied warranty on the part of the carrier that his vessel shall be seaworthy, not only when she begins to take cargo on board, but when she breaks ground for the voyage. The theory of the law is that the implied warranty of seaworthiness shall protect the owner of the cargo until his policy of insurance commences to run; and, as it is well settled that the risk under the policy attaches only from the time the vessel breaks ground, this is fixed as the point up to which the warranty of seaworthiness extends."

Although in the present charter party there is an express warranty of seaworthiness, it is silent as to the time when the warranty is to attach or to be satisfied. The statement is that the vessel shall be staunch, strong, etc., "for such a voyage," and the only voyage mentioned in the instrument is "from New York to Progreso, and back again to New York or Boston." The warranty does not qualify in the slightest degree the ordinary obligation of the shipowner under an implied warranty of seaworthiness. Although the contract contemplates the hauling of the ship from one part of the

harbor in New York to another, for the purpose of enabling her to be loaded, there is nothing in it to mark that circumstance as anything beyond a preliminary to the commencement of the voyage. The provision for it is incidental to matters of demurrage and expense of towage. It is preposterous to suppose that the parties intended that the warranty should extend only to the fitness of the vessel to proceed from one point to another in the harbor of New York. The warranty that the vessel is tight and fit for the employment for which she is offered—that is, for the contemplated voyage on which she is to carry cargo—is the very foundation and substratum of the contract of charter. The exception in a charter party as to dangers of the seas and navigation is not applicable to the perils and dangers which arise from the breach of the shipowner's obligation. Ang. Carr. §§ 166, 226. Consequently it does not apply to the warranty of seaworthiness. Undoubtedly, in cases where, under the language of the charter party, the warranty is satisfied if the vessel is seaworthy at the commencement of a voyage preliminary to her being laden, the shipowner is relieved by the exception from liability for any peril of the seas or navigation which are subsequently encountered without fault or negligence on his part. Bruce v. Nicolopulo, 11 Exch. 129; Barker v. McAndrew, 18 C. B. (N. S.) 759; The Carron Park, 15 Prob. Div. 203. In Crow v. Falk, 8 Adol. & E. (N. S.) 467, the charter party contained the usual recital that the ship was tight, etc., and provided that she should load a cargo at Liverpool, where she was then lying, and proceed to Stettin, and deliver it. It contained the usual exception of restraint of princes and rulers, and of the dangers of the sea and navigation. The court held that the exception was only applicable to the time after the commencement of the voyage from Liverpool. Although the correctness of this decision was questioned by Pollock, C. B., in Bruce v. Nicolopulo, 24 Law J. Exch. 321, it was approved by Cockburn, C. J., in Valente v. Gibbs, 6 C. B. (N. S.) 270. In all these adjudications the question was as to the meaning of the contract of the parties. This must be decided in each case by applying the rules of interpretation to the contract in hand.

There is nothing in the language of the bond which imposes upon the respondents the responsibility for any loss which is not the subject of an average contribution. The provision that the losses and expenses are to be stated and apportioned in accordance with the established usage and laws of this state in similar cases refers only to the mode of computing the amount to be paid in case any payment shall be made to appear to be due from the respondents. The libel, in stating the agreement between the parties, states it according to its real tenor and effect, as one whereby the respondents agreed to pay their ratable share of the losses and expenses, "provided it be made to appear that a general average charge would be due from the cargo if it had been first discharged and stored to enable said repairs to be made."

We conclude, therefore, that the complainants were solely responsible for all the losses and expenses incident to repairing and dock-

ing the vessel, because these accrued by reason of her unseaworthy condition before she was ready to sail. Having reached this conclusion, it is not necessary to decide whether, because the cargo itself was not in any peril, there was a proper case for general average. The decree appealed from is affirmed.