### ONEIDA NAV. CO. v. L. RICHARDSON & CO., Inc.

(Circuit Court of Appeals, Second Circuit. May 29, 1922.)

No. 290.

1. Shipping ⬅➡42—Defects in vessel, when charter entered into, not ground for cancellation of charter, if ship in seaworthy condition before date on which required to report.

Where charter gave charterers the option to cancel the charter on vessel's failure to report for cargo on or before a specified date, unseaworthiness of vessel at the time the charter was entered into is not ground for cancellation of charter notwithstanding warranty of seaworthiness, if the vessel was put in seaworthy condition before such specified date.

2. Shipping ⬅➡39—Reciprocal provisions of charter party must be complied with.

A charter party is a commercial contract, whose reciprocal provisions must be complied with.

3. Shipping ⬅➡42—Charterers held entitled to cancel charter for unseaworthiness of vessel on cancellation date.

Where charter party gave charterers the option to cancel charter on failure of the auxiliary schooner to report for cargo on or before a specified date, and on such date the auxiliary engines were not connected with the oil tanks, nor assembled, the charterers could cancel the charter under a provision of the charter warranting seaworthiness.

Libel in admiralty by the Oneida Navigation Company against L. Richardson & Co., Incorporated. Decree of dismissal, and libelant appeals. Affirmed.

Goldman & Unger, of New York City (John M. Woolsey, William F. Unger, and Theodore M. Hequembourg, all of New York City, of counsel), for appellee.

Harrington, Bigham & Englar, of New York City (T. Catesby Jones and Vine H. Smith, both of New York City, of counsel), for appellant.

Before ROGERS, HOUGH, and MAYER, Circuit Judges.

MAYER, Circuit Judge. The action is in admiralty, in effect to recover damages for the alleged wrongful cancellation by the charterer of a charter party dated September 18, 1918, of the "American auxiliary schooner Percy Pyne II of New York." This charter was executed while the schooner was on a voyage from Africa to Boston. On her arrival at Boston on September 30, 1917, it was found that she was in a very badly damaged condition, although neither party had any knowledge of such condition at the time the charter was made.

The charter party described libelant as owners "of the American auxiliary schooner Percy R. Pyne II of New York, classed A1 American Bureau of Shipping, of the burthen of 1,259 tons or thereabouts, registered measurement. * * *" The charter, inter alia, contained the following provisions:

"The said vessel shall be tight, staunch, strong, and in every way fitted for such a voyage, and is to receive on board during the aforesaid voyage merchandise hereinafter mentioned."

"Lay days for loading not to commence before November 15, 1917, unless by charterer's consent, and should vessel not report for cargo on or before December 31, 1917, charterers shall have the option to cancel this charter."

[1] The vessel reached New York on October 10, 1917, and at that port completed the unloading of her cargo. Early in November, 1917, extensive repairs were started and the work went forward with great diligence. On December 31, 1917, there was still much to be done. We shall not pause to analyze the testimony as to the details in respect of the pump, the presence or absence of the wood lock on the rudder, or the rose box. If these and certain other deficiencies had later been taken care of, we should not have found difficulty in holding, in all the circumstances, that the vessel was seaworthy on December 31, 1917, because it might fairly and reasonably be expected that in regard to these details the vessel could have been put in order and in seaworthy condition against the time of sailing.

[2, 3] At midnight on December 31, 1917, appellee gave notice of cancellation. At that time the auxiliary engines were not connected with the oil tanks, nor assembled, though the parts of the engines had been placed on board. It is vital to realize that a schooner does not become an auxiliary until she has motive power, and plainly an essential feature of the contract was that the schooner should, as described, be an auxiliary. The District Court found that "the engine probably could have been assembled and connected within eight or nine days," and we

are inclined to the view that the testimony justified this conclusion. Nevertheless, on December 31, 1917, an operative working engine had not been installed, and, obviously, no one could know whether an uninstalled engine would work properly and perform its necessary functions. No one can surely prophesy how an engine will work until a trial trip shall have been had, or such other appropriate test shall have been made, as is ordinarily engaged in by those skilled in this class of work. The result is that on December 31, 1917, it was impossible to predict with any degree of certainty when the vessel would be equipped as an auxiliary schooner, and it is certain that upon that date it was not an auxiliary schooner.

A charter party, as may be tritely observed, is a commercial contract, whose reciprocal provisions must be complied with. It may very well be that, owing to falling freight rates, appellee was keen to avail of its right to cancel, and, had the situation been otherwise, would have been glad to forgive the delay. But, because a party stands strictly on his rights, the court must not be tempted to write some contract other than that entered into by the parties. We recently reviewed some aspects of seaworthiness in another connection. Adams v. Bortz, 279 Fed. 521. Seaworthiness is a relative term, and often becomes a question of degree, and thus, usually, is a question of fact, and so a vessel may be seaworthy while loading, and not seaworthy when breaking ground, or vice versa. Bowring v. Thebaud, 56 Fed. 520, 5 C. C. A. 640; The Eugene Vesta (D. C.) 28 Fed. 762; Cohn v. Davidson, 2 Q. B. D. 455; The Caledonia, 157 U. S. 124, 15 Sup. Ct. 537, 39 L. Ed. 644.

Carver in his Carriage of Goods by Sea (6th Ed.) p. 27, states:

"The warranty of seaworthiness for the voyage must be satisfied at the time of sailing with the cargo. It is not sufficient that the ship was fit for the voyage while the cargo was being taken in, if she became unfit before she started. The warranty, in truth, appears to be a double one, viz. that the ship shall be fit to receive the cargo when receiving it, and shall be fit to sail at the time of sailing. * * * Similarly the warranty of fitness to receive the cargo is not a continuing warranty after the goods are put on board; the warranty is that at the time the goods are put on board the ship is then to receive them and encounter the ordinary perils during the loading stage."

But this broad definition, while sound, must always be read with and applied in respect of the particular facts under consideration and the same may be said of Scrutton's observation in Charter Parties (9th Ed.) p. 127, quoted in the margin.[1]

In Maritima Suares, S. A., v. Louis Dreyfus & Co., Ct. of Appeal (March 1, 1922), Lloyd's List Law Rep. Hilary Sittings, Vol. X, No.

[1] "Article 40—*Readiness to Load.* A ship to be ready to load must be completely ready in all her holds, so as to afford the charterer complete control of every portion of the ship available for cargo. She must also, in the absence of special stipulation, have obtained all papers and permits necessary for loading. But the degree of necessary readiness of the ship for her part is relative to that of the charterer or the consignee for theirs. Therefore the ship need not be absolutely ready (e. g., by having all her gear fixed up for the work) at a time when the charterer or consignees are not in a position to do any of their part of the work, so long as the ship can be absolutely ready as soon as they are."

399 (adv. Sheets, March 16, 1922), the court held that the ready condition of the ship to load did not mean "that every single thing which it may be necessary or wise to do for the protection of the cargo on the voyage has been done." The vessel in that case was "absolutely ready and fit," except in respect of some loose rivets and the difficulty was so trifling that it was cured in 20 minutes. That case is strongly illustrative of the proposition that the determination of the fact of seaworthiness is often a question of degree.

In the case at bar, we are inclined to believe, as we have already indicated, that there would have been no difficulty in making the ship seaworthy in respect of the pump and other details, and that the court would not have been astute to permit the charterer to escape, if the alleged unseaworthiness had been confined only to such details. Where, however, on the cancellation date, a vessel chartered as an auxiliary schooner is not an auxiliary schooner, and no one with certainty can prophesy if and when the engines will work properly, and if and when the vessel will be transformed into an auxiliary schooner, we think that the shipowner has failed to carry the burden cast upon him, as in this case, of showing that the vessel is seaworthy. Tully v. Howling, 2 Q. B. D. 182. This, in our opinion, is the point of the case at bar, which compels the conclusion that the District Court was right.

Decree affirmed, with costs.