## THE SAGAMORE. ROESSLER & HASSLACHER CHEMICAL CO. v. NYPANIA TRANSP. CO., Inc. NEW YORK & NEW JERSEY STEAMBOAT CO. v. SAME.*

(Circuit Court of Appeals, Second Circuit. April 28, 1924.)

Nos. 333, 334.

1. **Shipping** ⬅42—**To constitute "seaworthiness," vessel must be fit to carry cargo it has undertaken to transport.**

The test of "seaworthiness" is whether the vessel is reasonably fit to carry the cargo she has undertaken to transport.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Seaworthy—Seaworthiness.]

2. **Shipping** ⬅42—**Implied warranty of "seaworthiness" in charter includes ability to carry full cargo.**

The law implies a warranty of "seaworthiness" of a vessel for the purpose for which she is chartered, which includes her ability to carry the full cargo which her measurements and tonnage entitle her to carry, and the owner is responsible for her failure to do so.

3. **Shipping** ⬅42—**Sinking of steam lighter under charter held due to unseaworthiness.**

The sinking of a steam lighter, after she had been loaded by the charterer and had moved to her unloading pier, *held* not due to overloading, or improper loading, but to leakage through openings in her hull, which, when she was loaded, were below the water line, and which rendered her unseaworthy.

4. **Shipping** ⬅42—**Charterer not liable for failure to return vessel in good condition, where due to her unseaworthiness.**

Failure of a charterer to return the vessel in good condition, as required by the charter, is not a breach of the contract, when it was due to her unseaworthiness, and where she was unseaworthy the burden rests on the owner to prove that the disaster which happened was not due to that cause.

5. **Guaranty** ⬅36(1)—**Effect of guaranty of charter contract stated.**

A guaranty of performance by a charterer of the charter contract *held* to extend no further than to the obligation of the charterer to pay the hire and to return the vessel in the good condition required by the charter party.

6. **Shipping** ⬅58(3)—**Recovery for loss of cargo held limited to amount of insurance thereon.**

Where a charterer agreed to carry insurance sufficient to protect the cargo owner, the owner of the vessel, and itself, but by agreement between the parties the owner of the cargo procured the insurance thereon, its right to recover from the charterer for loss of the cargo *held* limited to the amount of the insurance.

On Reargument.

7. **Shipping** ⬅58(3)—**Charterer held, under the circumstances, primarily liable for loss of cargo through unseaworthiness of vessel.**

Where a charterer contracted to carry cargo insurance sufficient to fully protect the vessel owner, as well as owner of the cargo, which contract was guaranteed by the cargo owner, the charterer *held* primarily liable for loss of the cargo, though it was caused by unseaworthiness of the vessel.

Appeals from the District Court of the United States for the Eastern District of New York.

Libel filed by the Roessler & Hasslacher Chemical Company against the Sagamore, with the New York & New Jersey Steamboat Company

as claimant, to recover for loss of cargo. From the decree, libelant appeals. Reversed.

Libel filed by the New York & New Jersey Steamboat Company against the Nypania Transportation Company, Inc., to recover damages for injury to the Sagamore while under charter to the Nypania Transportation Company, Inc., caused by her sinking. Decree for libelant, and respondent appeals. Reversed.

Theodore L. Bailey, of New York City, for Roessler & Hasslacher Chemical Co.

Gifford, Hobbs & Beard and Merrill, Rogers, Gifford & Woody, all of New York City (Wilson B. Brice, of New York City, of counsel), for Nypania Transp. Co.

Haight, Smith, Griffin & Deming, of New York City (Henry M. Hewitt, of New York City, of counsel), for New York & New Jersey Steamboat Co.

Before ROGERS, HOUGH, and MANTON, Circuit Judges.

MANTON, Circuit Judge. These suits were tried together and will be considered in one opinion. The appellant the Roessler & Hasslacher Chemical Company brought suit against the appellee to recover for loss of a cargo which was transported on the steam lighter Sagamore from a pier at its factory at Perth Amboy, N. J., to Pier 65, North River, New York City. On the 6th of January, 1920, the appellant Nypania Transportation Company, Inc., in effect chartered the steam lighter Sagamore from the appellee, New York & New Jersey Steamboat Company, its owner, for the purpose of transporting the products of The Roessler & Hasslacher Chemical Company. The charter provided that the vessel be, on her delivery, tight, staunch, and strong, and fully equipped with necessary engine and machinery, all in first-class condition. It ran for three months, and the charterer agreed to deliver the vessel, at the expiration thereof, in like good order and condition, ordinary wear and tear excepted. The charterer agreed to carry insurance sufficient to fully protect the cargo owner, the owner of the vessel and itself. The appellant the Roessler & Hasslacher Chemical Company, in a separate writing, guaranteed the payment by the appellant Nypania Transportation Company, Inc., of all the obligations of said Transportation Company under and by reason of the charter party. In the suit of the Roessler & Hasslacher Chemical Company against the appellee for damages to its cargo, the New York & New Jersey Steamboat Company filed a petition under the Fifty-Third Admiralty rule, bringing in the Nypania Transportation Company, Inc., as respondent.

The Sagamore arrived at the dock at Perth Amboy on May 15, 1920, and finished loading cargo on May 17th. She left at about 2 p. m. that day, proceeding to Elizabethport, where she took on water, and from thence to a coal dock at Hoboken, where she coaled, taking on 17 tons. She proceeded thence to Pier 65, arriving at about 6:30 p. m. She carried a duplex pump and two siphons. After she left the coal dock, it was noticed that she was leaking, and the crew kept the pump and both siphons going for about an hour and a half, and again from

10:30 p. m. to 1:30 a. m. and again at 5 a. m., until the water got so high it put the fires out and they could not pump for want of steam. She sank with her cargo at about 7 o'clock on the morning of May 18th. There was no rough water or wind throughout the whole voyage or at the pier. She was later raised by the use of three slings, one around her stern, one around her stem, and the third between them.

· [1] The question presented below, as here, was whether the sinking was due to overloading of the vessel or to its unseaworthy condition. If the latter, the owner has failed in its promises contained in the charter to provide a vessel according to its terms. We cannot agree with the conclusions reached below that the sinking was not due to the unseaworthy condition of the vessel. The test of seaworthiness is whether it is reasonably fit to carry the cargo which it has undertaken to transport. The Silvia, 171 U. S. 462, 19 Sup. Ct. 7, 43 L. Ed. 241. If the owner fails in this, there is a breach of her warranty of seaworthiness. The Edwin Q. Morrison, 153 U. S. 199, 14 Sup. Ct. 823, 38 L. Ed. 688; The Carib Prince, 170 U. S. 655, 18 Sup. Ct. 753, 42 L. Ed. 1181. It appears that the Sagamore was 41 years old; it had been lengthened and rebuilt in 1904, and again in 1915. From April 20, 1920, to May 7, 1920, she was laid up for repairs, consisting of carpenter work, painting, and repairs to the boiler. Later her air pump, hoist engine, and main engine were repaired. This work was finished May 14, 1920. No repairs were made to her hull thereafter. She was caulked last in June, 1919. Her engineer testified that she was leaking at the stern, although he did not know the exact spot, but that it was not under water when she was light. She was under water when she was loaded, and he said this leakage was unusual. This was her condition for some time, and he expressed his opinion that, when loaded, she would be unsafe.

After an examination made by a government inspector, who found several leaks under her counter and on the starboard quarter, there was found on open space about 12 inches long and three-eighths of an inch wide. He thought her unseaworthy because of this. The open seam was well up under the counter and not easily observable. This leak was about 2 feet under water. The inspector stated that this 12-inch long open seam was not due to a strain, for in that event the oakum would have been loose at both ends of the open space, whereas he found the caulking in good condition on each end. Another inspector, who found the same opening in the seam, expressed the same opinion as to the vessel, and stated that it was his opinion that these leaks caused her to sink. There was other verification of this condition. After she was raised, she was taken in dock for repairs, and this seam was repaired. The fireman on the trip noticed water coming in her starboard side at 5 o'clock in the morning of the day she sank. It was abaft the engine. It came in on an extended space, as if through a seam. They started using the pumps after leaving the coal dock, and ran them for about an hour and a half, and he says they worked them again after they tied up at Pier 65 at about 8:30 the evening before she sank. At 5 a. m. the water was about knee deep in the fire room. It also appears that there had been inserted in a broken injection pipe a wooden plug 2½ inches in diameter. This led from the sea valve

to her condenser. The stem of the sea valve was broken, and the valve could not be closed. It was several feet below the level of the deck, and was used to draw cold water from the sea into the condenser, and was therefore always under water.

It is argued from this that the practical effect was the same as if there were a 2½-inch hole in her hold and a wooden plug inserted. This plug was placed there some time around April 1, 1920. At one time theretofore the plug came out and water ran in. There was testimony that this was a dangerous situation, but as long as the plug was tight, and held, there was little or no leaking. The engineer on the trip expressed his opinion that there was danger in using this plug. He thought she was unsafe with it. There is a conflict as to whether the plug was in place after she was raised.

The evidence does not justify the claim of the appellee that she was overloaded. She carried as much as 150 tons of freight. On this trip she had 141.7 tons, and with her bunkers filled with coal and her tanks filled with water, she would be carrying only that weight which it was calculated she could safely carry. About the time she reached the dock, her load was lightened by the consumption of water and coal. It is testified that she had 6 to 9 inches to freeboard under her guard on leaving Perth Amboy. She had no list either before or after sinking. Her captain said he did not think she was overloaded, either on this trip or when carrying full cargo. There is testimony that lighters of this type could be loaded down to the guards with safety, if her top sides were in good condition; but, if she were not tight up to the decks, she would be unseaworthy.

[2] We are satisfied that she did not sink on account of water pouring over her deck, but from water coming in below through her hull. When the examination was made after the hull was raised, there was no disclosure of open joints due to straining from overloading. The survey showed that, apart from the 12-inch opening in the seam and "some smaller leaks," the vessel's hold was in good condition. In considering whether she was overloaded, we may not take into consideration her defective condition. A staunch and seaworthy vessel should carry the full cargo which her measurements and tonnage entitle her to carry, and a charterer of a vessel has a right to expect her to carry such load. If she is unable to carry that amount of cargo because of any weakness, she must be deemed unseaworthy. Unseaworthiness is a comparative term. A vessel may be perfectly seaworthy for cargo-carrying purposes around the harbor, and not be seaworthy for oceanic carriage; and she may be seaworthy for the carriage of a load of lumber, and not be seaworthy for a load of steel rails. The law implies a warranty by the owner (indeed, it is expressed in the charter here) of seaworthiness for the purposes for which the Sagamore was chartered. The warrantor of the ability of the vessel to carry her full capacity of the freight contemplated by the parties is responsible for its failure so to do. Work v. Leathers, 97 U. S. 379, 24 L. Ed. 1012; The Willie (D. C.) 134 Fed. 759.

[3, 4] We think the evidence supports the claim that, if the vessel was in seaworthy condition, she could have carried the load placed

upon her, and for this reason there was no overloading. The explanation of the sinking is found in the unseaworthy condition, and, since there was no negligence on the part of the charterer which brought about this condition of the vessel, we conclude that the owner did not furnish a vessel which was tight, staunch, and strong and in first-class condition. A vessel being unseaworthy, liability cannot be escaped without the clear showing that the disaster was bound to have happened despite the unseaworthiness, and this burden rests on the owner. The Viking (C. C. A.) 271 Fed. 801. Therefore the charterer, as bailee, did not breach the contract to return the ship in good order and condition.

[5, 6] The letter of January 15th from the appellant the Roessler & Hasslacher Chemical Company to the appellee, we think, was intended to guarantee the obligation of the Transportation Company merely as to the obligation to pay the hire and to deliver the vessel in as good condition as received, ordinary wear and tear excepted. But this letter did not relieve the owner from the obligation flowing from the failure to deliver a seaworthy vessel under the terms of the charter. The obligation to safely transport the cargo was upon the appellant Nypania Transportation Company, Inc. It is primarily liable for failing to fulfill this obligation, but the appellee is secondarily liable. It appears by agreement between the parties that the policy of insurance on the cargo was taken out by the Roessler & Hasslacher Chemical Company, and the recovery which will be granted to the cargo owner will be limited to the amount of insurance, for we think the parties have in effect created this limitation of liability.

The decrees are reversed, with directions to the District Court to enter a decree in favor of the appellant the Roessler & Hasslacher Chemical Company for an amount equal to the sum of the insurance against the appellant Nypania Transportation Company, Inc., primarily, with secondary liability against the appellee New York & New Jersey Steamboat Company, and to enter a decree dismissing the libel of the New York & New Jersey Steamboat Company against the appellant Nypania Transportation Company, Inc.

Decrees reversed.

On Reargument.

PER CURIAM. Reargument is prayed for, seeking to change the conclusion we reached in holding the Nypania Transportation Company, Inc., primarily liable, and the Sagamore secondarily liable, for the loss of cargo.

[7] The owners of the Sagamore would be held primarily responsible for the loss of cargo, since we have found that vessel was unseaworthy, but for the special circumstances disclosed by this record. Julia Luckenbach, 235 Fed. 388, 148 C. C. A. 650; The Lake Allen (D. C.) 274 Fed. 873. The suit was originally begun in rem against the Sagamore, and the Nypania Transportation Company, Inc., was petitioned in by the owners. The charter provided for the hire of the Fannie, but by a later agreement the Sagamore was substituted. Paragraph 6 thereof provided that "the charterers will carry sufficient cargo insurance to fully protect the cargo owner and the owner of the vessel and the charter." This insurance was provided by the charterer. Such

cargo insurance was to protect the owners of the vessel as well as the cargo owner. Cargo insurance may be obtained on a vessel which proves to be unseaworthy. It could have been obtained upon an unseaworthy vessel, known to be so, although the rate would be high, as is illustrated in Arnould on Marine Insurance and Average (10th Ed.) vol. 2, p. 1696. We cannot change the contract the parties have made. The cargo owners, the Roessler & Hasslacher Chemical Company, guaranteed the performance of paragraph 6 in the following letter:

"New York, Jan. 15, 1920.

"New York & New Jersey Steamboat Co., Pier No. 32, East River, New York City—Attention: Mr. Hornbeek. Gentlemen: In accordance with our verbal agreement, we hereby guarantee the payment by Nypania Transportation Company, Inc., of all of the obligations of said Transportation Company, under or by reason of the charter party entered into between your company and said Nypania Transportation Company under date of January 6, 1920.

"Yours very truly,    The Roessler & Hasslacher Chemical Co.,
"P. Samuel Rigney, Asst. Treasurer."

A guaranty of the terms of this charter may be made by the cargo owner, for the Nypania Transportation Company, Inc., was not a common carrier. The Wildenfels, 161 Fed. 864, 89 C. C. A. 58. Two of the policies issued for such protection gave the cargo owner the right to release any claim against the carrier in the following phrase:

"Permission is hereby given the assured to release the carrier from liability, and such action shall be without prejudice to this insurance."

It is clear that it was the intention of the parties to insure the cargo for the protection of the vessel owner as well as the cargo owner. By the parties' agreement, the Nypania Transportation Company, Inc., assumed this obligation of insurance protection, and it is for that reason we hold it primarily liable.

Application for reargument is denied.