### THE FRED E. HASLER.

### PROCTOR & GAMBLE CO. v. ATLANTIC OIL TRANSIT CORPORATION.

District Court, S. D. New York.
April 27, 1931.
May 1, 1931.

Haight, Smith, Griffin & Deming, of New York City (Charles S. Haight and Wharton Poor, both of New York City, of counsel), for libelant.

Burlingham, Veeder, Fearey, Clark & Hupper, of New York City (Chauncey I. Clark, Eugene Underwood, and Adrian J. O'Kane, all of New York City, of counsel), for respondent.

PATTERSON, District Judge.

Suit is brought to recover the value of a cargo of whale oil lost through the sinking of the tank barge Hasler. The libelant had chartered the Hasler from the respondent to take a cargo of whale oil from the steamer Sir James Clark Ross which lay at Pier 6, Staten Island, to Port Ivory on Staten Island. The Hasler was in charge of one Valerio, a man in the owner's employ. The pumping of the oil from the Ross into the Hasler commenced shortly after noon on April 15, 1929, and was finished shortly before midnight, when the bargee signified that the Hasler had a load. It then had freeboard of about six inches in the middle and two feet on the ends. A violent storm came up in the early morning of the 16th, which prevented moving the barge. It sank about 5 a. m., while still lying alongside the Ross, bow end inshore, and the oil was practically a total loss. The libelant brought suit on contract against the barge in rem and the owner in personam, alleging unseaworthiness.

The Hasler was a steel barge, two hundred feet long by thirty six feet wide, with eight tanks. Each tank had two hatches and two gooseneck vents and was connected with the other tanks by equalizing valves. To furnish buoyancy, it had forepeak and afterpeak compartments, each with two hatches. It is beyond controversy that the barge was in good condition at the time, so far as structure and equipment were concerned. When such a barge has its hatch covers securely fastened, it is practically unsinkable, even when the tanks are filled with oil; indeed, it is common to see barges of this type being towed around the harbor with decks awash.

The libelant's theory of the sinking is that the hatch covers on the peak compartments and others as well had not been securely fastened, if fastened at all. The force of the waves during the storm would then move the covers and the compartments would fill with water. With the compartments full of water, the barge would have no buoyancy and would sink. This theory is supported both by evidence of a satisfactory character and by the probabilities of the case. On the day after the sinking, two divers examined the Hasler as it rested on bottom. Their mission was to save the oil by plugging the gooseneck vents and making certain that the hatch covers were tight. They testified to finding one of the forepeak hatch covers off and several of the hatch covers on the tanks off or loose. They did not examine the afterpeak hatches. When the barge was raised on the 21st, four marine surveyors, including a representative of the owner, were present. All of them said that as the barge broke water they noticed that the afterpeak hatch covers were not in place. When the barge was examined in dry dock the next day, no damage could be found other than a crack on the deck which probably developed in the course of lifting the barge from the bottom. The hatch covers and fastenings were in good order. The only testimony in contradiction of this theory is that of the bargee who said that he had securely fastened all the hatches. At the trial it was suggested by the respondent that the hatch covers might have been loosened by the violent pounding of the waves upon the deck. The opinion of the expert witnesses was that this could not have happened with covers fastened securely at the outset, there having been no hatch breakages visible afterwards.

The respondent also put forward the theory that the barge was pushed down by the weight of the water on the deck. It is true that the barge was boxed in by the Ross and by other craft with higher freeboard and doubtless its stern got the full vigor of the waves, but the theory is an impossible one. The deck was a flat one, without sides. With hatches properly covered, the barge had buoyancy and would rise again. The water could not remain in piles or heaps upon the deck. In its brief, the respondent advances a third proposition, that water was forced through the gooseneck vents. While more plausible than the others, this theory is also untenable. The openings on these curved pipes were over a foot above the deck, and

their diameter was only five and one-half inches. Some water undoubtedly did enter the tanks through the pipes, but they could not have taken water fast enough to put the vessel into a sinking condition in two or three hours. The argument assumes that water was rushing into the tanks in sufficient volume, not only to fill them, but to displace and force out a large quantity of the lighter oil; only in this way could the barge have gone down, for the peak compartments had no vents and the air in them furnished enough buoyancy to permit the flow of water into the tanks so as to fill them without any sinking. And of course this theory utterly disregards the testimony given by the divers and by the witnesses who saw the barge being raised.

Several witnesses for the respondent called the storm one of unprecedented violence, and stated that conditions in the vicinity of Pier 6 were very bad as early as midnight. From other evidence, however, it seems to me that the wind and waves, while unusually high, were by no means the worst on record, and that their force did not seriously affect this barge until after 3 o'clock on the morning of the 16th. It was not until about 3:40 that the bargee became alarmed and reported that the Hasler might go adrift and blow further into the slip. An hour later he reported that it was sinking. Upon the entire case, the most reasonable conclusion from the evidence is that some of the hatch covers were not fastened, and that the sinking was attributable to this fact. This omission was of course negligent on the part of the bargee, who appears also to have been negligent in not having summoned help from the neighboring vessels in an effort to save the barge.

■ Was the barge thus rendered unseaworthy, and was there a breach of any warranty of seaworthiness? The suit is not based upon mere negligence on the part of the bargee. The libel charges that under the charter the respondent warranted the seaworthiness of the Hasler, that the Hasler was in fact unseaworthy, and that the loss of the cargo resulted from such breach of warranty. The libelant, doubtless with an eye to the limitation of liability aspect of the matter which may come up at a subsequent stage, has seen fit to plead and to try the case as one involving breach of warranty by the respondent. Unless such a breach can be established, the libel must be dismissed.

■ The charter in this case was oral, and there was an implied warranty by the owner that the barge was seaworthy. The Edwin I. Morrison, 153 U. S. 199, 210, 14 S. Ct. 823, 38 L. Ed. 688; Oxford Paper Co. v. The Nidarholm, 282 U. S. 681, 51 S. Ct. 266, 75 L. Ed. 614, 1931 A. M. C. 522, 524, decided by the Supreme Court February 24, 1931; Poor on Charter Parties, § 3. The test of seaworthiness is whether the vessel is reasonably fit to carry the cargo undertaken to be carried. The Sagamore (C. C. A.) 300 F. 701, 703. "Seaworthiness" is given a wider application than the word itself imports. The Newport (C. C. A.) 7 F.(2d) 452. The first thing one thinks of in connection with seaworthiness is the condition of the hull and the equipment; but it has long been settled that a vessel may also be rendered unseaworthy because of bad stowage. Oxford Paper Co. v. The Nidarholm, supra; Olsen v. United States Shipping Co. (C. C. A.) 213 F. 18. Unseaworthiness may also result from careless use of good equipment before the vessel breaks ground. The warranty calls for "due diligence on the part of all the owner's servants in the use of the equipment, before the commencement of the voyage." International Navigation Co. v. Farr & Bailey Mfg. Co., 181 U. S. 218, 225, 21 S. Ct. 591, 593, 45 L. Ed. 830. See also The Newport, supra; The President Polk (C. C. A.) 43 F.(2d) 695. It seems clear, therefore, that a tank barge so laden that it has only two feet freeboard is not seaworthy where its hatches are not securely fastened when the vessel is ready to sail. A tank barge light is doubtless seaworthy with hatches left open, but the same cannot be said of a loaded barge. In this case the unseaworthiness is attributable to the owner, for the bargee remained its representative so far as the care of the barge and its internal economy are concerned, notwithstanding that the charter was a demise of the barge. Dailey v. Carroll (C. C. A.) 248 F. 466; The Junior (C. C. A.) 279 F. 407.

■ But it is urged that there was no breach of warranty, because the implied warranty of seaworthiness, it is said, is narrowly limited as to time. No one will dispute that ordinarily there is no implied warranty that a vessel will continue seaworthy after commencement of the voyage. The Steel Navigator (C. C. A.) 23 F.(2d) 590. It is said in Carver on Carriage by Sea, § 21, that the warranty of seaworthiness is a double one, "viz., that the ship shall be fit to receive the cargo when receiving it, and shall be fit to

sail at the time of sailing"; and that "the warranty of fitness to receive the cargo is not a continuing warranty after the goods are put on board; the warranty is that at the time the goods are put on board the ship is then fit to receive them and encounter the ordinary perils during the loading stage." McFadden v. Blue Star Line, [1905] 1 K. B. 697, supports the above statement by Carver. The owner's argument is that neither branch of the warranty was broken; the first was not broken because the barge was fit to receive the oil when it was loaded, and the second was not broken because the barge never left its mooring. There are indications, however, that the warranties are not so momentary, that on the contrary there is a general warranty of seaworthiness that continues in operation from the commencement of loading until the breaking of ground. The Eugene Vesta (D. C.) 28 F. 762; Bowring v. Thebaud (C. C. A.) 56 F. 520, 523–525; The Caledonia, 157 U. S. 124, 132, 15 S. Ct. 537, 39 L. Ed. 644; compare Reed v. Page, [1927] 1 K. B. 743. But even if the statement by Carver be taken as sound, I think that there was a breach of the implied warranty. The loading of the oil into the barge was not completed, in my opinion, until the hatches were fastened. Their fastening belonged to the loading stage. The barge with loose hatches was not in fit condition to receive the cargo when receiving it. The owner's contention that the first branch of the double warranty relates only to the ship's condition "when loading begins" is an undue restriction upon the statement by Carver for which I cannot find any authority. Any such rule would exempt an owner in a case of unseaworthiness caused by overloading, where the vessel sank prior to commencement of the voyage. It cannot be the law.

As for the damages, I am satisfied that the cargo on board amounted to 1,522.5 tons of oil. The value of this tonnage, at $147.70 a ton, was $224,873.25. There was a salvage of oil worth $8,220.73. The loss was therefore $216,652.52, for which the libelant may have a decree against the barge and against the respondent.

#### Memorandum.

I will withdraw the finding as to the amount of the libelant's damages and will sign an interlocutory decree, referring the matter of damages to a commissioner.