AMERICAN AGR. CHEMICAL CO. v.
O'DONNELL TRANSP. CO., Inc., et al.

O'DONNELL TRANSP. CO., Inc., v.
REPUBLIC STEEL CO.

THE HUGH O'DONNELL.

District Court, S. D. New York.
May 29, 1945.

240

Bigham, Englar, Jones & Houston, of New York City (R. F. Shaw, of New York City, of counsel), for libellant.

Macklin, Brown, Lenahan & Speer, of New York City (Leo F. Hanan and J. F. Quarto, both of New York City, of counsel), for respondent.

Maclay, Lyeth & Williams, of New York City (Mark W. Maclay, of New York City, T. R. Wheeler, of Buffalo, N. Y., and A. J. Gentholts, of Cleveland, Ohio, of counsel), for respondent impleaded.

CONGER, District Judge.

I have before me two actions. They were consolidated for the purpose of trial only.

In the first action, libellant American Agricultural Chemical Company, hereinafter referred to as the American Company, seeks to recover from the respondent O'Donnell Transportation Co., Inc., hereinafter referred to as the O'Donnell Co., damages for loss of cargo. The above respondent has brought into this action by interpleader the Republic Steel Corporation, hereinafter referred to as Republic Steel, as a respondent.

In the second action, O'Donnell Co. sues to recover from Republic Steel for the damage which happened to its barge "Hugh O'Donnell."

Both actions were the result of a misfortune which occurred to this barge and which was caused by the following set of circumstances.

During the month of August, 1942, the American Company and the O'Donnell Co. entered into an agreement in and by which the O'Donnell Co. agreed for a stipulated freight to receive, transport and deliver for the American Company two cargoes of sulphate of ammonia. The cargoes were to be moved by barges from the plant of the Bonner-Hanna Coke Corporation plant at Buffalo, New York, to the plant of the American Company at Cartaret, New Jersey.

Pursuant to the said agreement, the O'Donnell Co. furnished two barges, the "Hugh O'Donnell" and the "Gwynn." These barges were loaded at the concrete dock of the Republic Steel. The loading was completed in the early morning of October 25, 1942 (Sunday).

John P. Feeney was the employee of the O'Donnell Co. who had charge of the O'Donnell boats when they were in Buffalo. He had been given notice by the Superintendent of Transportation of Republic Steel that the O'Donnell barges must be moved from the dock of the Republic Steel where they were moored. Mr. Feeney thereupon attempted, with some help, to shift the barges by hand from the ore dock to the B & O dock which was just beyond the said steel dock. In doing so the

stern of the "Hugh O'Donnell" came in contact with the steel dock of Republic Steel thereby causing the barge to leak heavily and sink shortly thereafter. As a result the cargo was a complete loss and the barge was damaged, necessitating, it is claimed, quite extensive repairs.

I shall first discuss the claim against the Republic Steel, impleaded respondent, in one action and respondent in the other.

The main contention of the O'Donnell Co. is that "while the barge 'Hugh O'Donnell' was being moved along the dock of the Republic Steel Corporation, due to the unsafe, broken-down and dilapidated condition of the dock, the barge 'Hugh O'Donnell' was caused to strike and catch on a broken piece of steel piling which ripped loose a stern plank of the barge, causing her to leak heavily, and sink shortly thereafter." Par. Four, O'Donnell Co. libel.

There is another charge of negligence made by the O'Donnell Co. and that is that the Superintendent of the Republic Steel ordered the barges moved from their loading berth to another berth and that while the maneuvering was taking place the barge was damaged, as I have indicated above. I do not take this charge of negligence very seriously.

The Republic Steel had two docks there; the ore dock to which the barges were tied up and the steel dock a little further along the river. Both were busy docks. Sunday afternoon and evening and Monday morning vessels were expected to use these docks.

This information was conveyed to Mr. Feeney and he was asked to take his barges from the ore dock and not to use the steel dock. I see nothing out of the way with this. The Republic Steel needed its dock facilities for other vessels coming. There was other dockage in the vicinity. There was no special reason for the barges to remain where they were, at least none was offered during the trial. The barges were fully loaded. When told that the barges were in the way and that they would have to be moved, Mr. Feeney made no protest; at least there is no proof that he made any.

He testified that he tried to get a tug to move the barges and failing to get one he started to shift the barges by hand, a procedure which the testimony shows was not new to Mr. Feeney.

In connection with the claim of negligence that the steel dock was out of repair and unsafe, there is the further claim that the Republic Steel and its employees failed to give any warning to the "Hugh O'Donnell" or those in charge of her as to the unsafe condition of the dock.

The steel dock was fairly new; built in 1937. It was faced with steel interlocking piling driven into the bed of the stream. From photographs in evidence, it appears from the water line up at least to be sturdy and in good condition; certainly not dilapidated.

The defect in the dock, if any, was below the water line. Of course, the burden of proof is upon the libellant O'Donnell Co. to prove that such a defect and unsafe condition existed and that this caused the damage to the barge. In this libellant O'Donnell Co. has failed. It has not sustained that burden.

Part of libellant's contention is based upon the manner in which the steel piles were constructed. When construction of the dock was first started the steel piling used was 50 feet long. As the work progressed it was discovered that the pilings were not long enough.

To make them longer an extra piece was welded and bolted on the end of each pile. Part of libellant's contention is that this welded and bolted part projected out into the water. It also attempted to prove by a diver who inspected the face of the dock under water subsequent to the accident, that he found a loose bolt and a loose plate about 2 or 3 feet under the water line.

I am satisfied that these plates, so welded and bolted, and the loose plate and the loose bolt were not such projections into the water that they could, would or did cause the damage to the "Hugh O'Donnell." Libellant O'Donnell Co. has failed to prove the existence of any projection along the face of the dock which might be classed as a defect or an obstruction which might be a menace to vessels either using or passing the dock.

It appears that from the fall of 1937 to May 1, 1944, 346 wooden vessels and 722 steel vessels (in all 1068 vessels) berthed at this dock and no claim had been made with respect to any of those vessels for anything defective about the dock. Of course, this is not positive proof that no such claimed defect existed but at least it should be considered.

It was in the early part of December, 1942, that the diver examined the face of the dock for the O'Donnell Co. It was then that he said he discovered the loose bolt on the face of the piling which he said projected into the water about 2 to 3 inches and was 2 to 3 feet under the water. I cannot find that this had anything to do with the accident to the "Hugh O'Donnell." The proof is too meager and conflicting. Near the downstream end of the steel dock there is a sewer discharging pipe emptying into the stream. From the description given by Mr. Feeney it is apparent that the barge came in contact with the dock at a point that is upstream from this discharge pipe. This is further corroborated by Mr. Feeney who fixed it at a point between the sixth or seventh bollard or mooring post on the steel dock. Both these mooring posts are upstream from the discharge pipe.

The diver for libellant testified that he examined the face of the dock about 50 feet upstream from the discharge pipe and about 100 feet downstream from it; that he could not tell just where he found the loose bolt but that it was some place in the 100 feet examined by him downstream from the discharge pipe. If that is so it could have nothing to do with the accident.

The diver for the Republic Steel who examined the dock a few days later said he found a loose bolt in the piling between the sixth and seventh bollard (upstream) from the discharge pipe; that it was only loose and would not pull in or out—simply could be turned around.

The diver for the O'Donnell Co. may have been mistaken in placing the location of the loose bolt. He may just as well have been mistaken as to the extent of its projection from the face of the dock. At any rate I am not convinced that this loose bolt had anything to do with the damage to the barge.

I think the accident may be laid to another cause and one which may be fairly inferred from the evidence.

The two barges were being shifted together along the stream; they were made up tandem; they were buckled up close together. As the barges left the ore dock they came to a space where there is no dock and at this point there is a sharp bend in the stream. Here the rope with which the men were pulling the barges was slackened and the boats allowed to drift around this turn. There was a discharge pipe at this point as well as one in the steel dock. As the barges were rounding the turn, or just after, the "Gwynn" was ahead and because of the current and because of the water coming out of the discharge pipe (or perhaps both) the "Gwynn" was caused to go away from the steel dock throwing the hind boat ("Hugh O'Donnell") stern into the dock hitting the steel piling.

I think that conditions at this point in the stream were a bit unusual. There was more water coming out of the discharge pipes than usual; there was a heavy current. It was coming down. There had been "quite a freshet." "All Friday night it poured rain." (Testimony of Captain Stern of the "Hugh O'Donnell.") In the language of Captain Stern, "with the current and that discharge pipe, on the steel dock, brushing against the bow of the 'Gwynn' with kind of—and the current coming down at the same time to the stern of the 'Hugh O'Donnell,' she dragged her stern right in there." The force of the impact is best described by Captain Stern: "* * * it slung the 'Hugh O'Donnell's' stern in and hit one of these piles, and it hit pretty heavy"; and by Captain Sessler of the "Gwynn," "She sets up again that dock pretty heavy."

"Q. And you fetched up pretty hard against the steel dock? A. Pretty hard, yes, sir."

"Q. And this point X is where the O'Donnell brought up against the steel dock with a good heavy impact? A. As near as I can explain it, yes, sir."

I can only conclude that by reason of the foregoing that the port stern corner of the "Hugh O'Donnell" went up and against one of the piles of the steel dock with such force that one of the stern planks of the "Hugh O'Donnell" was loosened to such an extent that it allowed water to leak into the barge in considerable quantities.

I find against O'Donnell Co. on this branch of the controversy.

I now take up the claim of American Company against O'Donnell Co.

Libellant American Company sues upon an oral contract of carriage made with respondent O'Donnell Co. It has the usual allegations of a libel of this type. It alleges delivery of the cargo to respondent by putting it on board respondent's barge "Hugh O'Donnell"; that after loading and prior to sailing the barge was caused and

allowed to sink by reason of which the cargo became a total loss and that thereby and in violation of its agreement respondent O'Donnell Co. wholly failed to make delivery of the cargo.

I am satisfied that libellant has made out a case and should succeed.

 Respondent insists the contract is one of private carriage, and that the burden is upon the libellant to establish by a fair preponderance of the proof the negligence of the carrier. I agree that the burden of proof is on libellant. I hold that it has met that burden in either of two ways: (1) The proof shows that the sinking of the barge was caused by the carelessness and negligence of Feeney in that the barge was caused to strike hard against the steel pier as a result of which the barge sprung a leak; that this was brought about by Feeney who was attempting by hand to pull the two barges down the river and around the bend, which in my opinion was careless and negligent under all the circumstances as I have outlined them above. (2) Under the other theory upon which respondent might be held liable, libellant has met the issue. There was an implied warranty by the owner (O'Donnell) that the barge was seaworthy. Before the voyage commenced this barge was not seaworthy. It was rendered unseaworthy by the negligence of the agent of the owner. It is not a sufficient answer that the barge was seaworthy when loading. The obligation and warranty goes beyond that. The Fred E. Hasler, D.C., 51 F.2d 779.

What I have above written is on the assumption that the contract was oral (made over the telephone) and confirmed by a letter or letters. Respondent contends that the bill of lading is also part of the contract. The oral agreement and the letters contain all the terms of the contract of carriage. Nothing was said or written about a bill of lading or that any other condition was imposed on either party except as agreed upon orally and by letter.

 The evidence about the bill of lading on the part of respondent is rather sketchy. I gather that an original bill of lading was mailed to libellant subsequent to the sinking of the barge. I can't find that by agreement or by inference the bill of lading was a part of the contract of carriage. Under the circumstances I can only regard the bill of lading as a receipt for the cargo. Its provisions, therefore, do not apply here. The G. R. Crowe, 2 Cir., 294 F. 506.

In order to dispose of all of the issues raised I shall assume in the remainder of this opinion that the bill of lading was a part of the contract of carriage and that its provisions should be considered.

 Respondent pleads in defense the Harter Act, 46 U.S.C.A. §§ 190–192.

In order that a carrier may take advantage of the exception provisions of the Harter Act, he must use due diligence to make the vessel seaworthy. This means seaworthiness at the commencement of the voyage. This could not be so in this case. The voyage had not yet commenced. The barge was being shifted from one dock to another. The voyage was to be from Buffalo to New York. It had not yet commenced. Under these circumstances the exemption provisions of the Harter Act afford no defense to the carrier. The Newport, 9 Cir., 7 F.2d 452; The Willowpool, D.C., 12 F.Supp. 96, affirmed 2 Cir., 86 F.2d 1002.

 For another defense respondent relies on the following provisions in the bill of lading:

"(c) If the owner shall have exercised due diligence in making the vessel in all respects seaworthy and properly manned, equipped and supplied, no such carrier shall be liable for any loss or damage resulting from the perils of the lakes, seas, or other waters, or from latent defects in hull, machinery or appurtenances whether existing prior to, at the time of, or after sailing, or from collision, stranding, or other accidents of navigation, or from prolongation of the voyage."

I can't see that this clause in anyway affects the situation here. I realize that a private carrier may make such an agreement, but as I read it I fail to see that it exempts from liability one who, before the voyage commences, renders a vessel unseaworthy by reason of the negligence of its own agent servants. It certainly does not do so in clear unequivocal language.

 Respondent has also pleaded a defense of limitation of liability under sections 4282, 4283, 4284, 4285 and 4286 of the Revised Statutes of the United States, 46 U.S.C.A. §§ 182–186.

I find against respondent as to this defense because (1) the accident did not occur without the privity and knowledge of respondent. Feeney, who was the prin-

244

cipal actor in the chain of events which lead to the accident, was the representative of respondent in charge of operations in Buffalo. In addition to his other duties he despatched "the fleet when they came in and left." Feeney's duties and connection with respondent were such that his privity and knowledge is chargeable to respondent and deprives it of the privilege of limitation. The New York Marine No. 10, 2 Cir., 109 F.2d 564. (2) There was an implied warranty of seaworthiness which is a part of the personal contract of carriage entered into between the cargo owner and the carrier. The barge was unseaworthy prior to the commencement of the voyage. This unseaworthiness was caused by carelessness and negligence of the agent of respondent O'Donnell Co. Under the authorities respondent by reason thereof may not have the benefit of the limitation of liability statutes. The Cullen No. 32, 2 Cir., 62 F.2d 68; The Fred Smartley, Jr., 4 Cir., 108 F.2d 603.

Libellant American Agricultural Chemical Company is entitled to a decree against the respondent O'Donnell Transportation Co., Inc., for its loss together with the costs of this action.

Submit decree on notice.