**AMERICAN MAIL LINE LTD.,**
**Plaintiff,**

v.

**UNITED STATES of America,**
**Defendant.**

**No. 17–72C2.**

United States District Court,
W. D. Washington.

June 12, 1974.

David M. Salentine, Bogle, Gates, Dobrin, Wakefield & Long, Seattle, Wash., for plaintiff.

Stan Pitkin, U. S. Atty., Albert E. Stephan, Asst. U. S. Atty., Seattle, Wash., William E. Gwatkin, III, Atty. in charge, West Coast Office, Admiralty and Shipping Section, Allan J. Weiss, Admiralty and Shipping Section, U. S. Dept. of Justice, San Francisco, Cal., for defendant.

## OPINION

BEEKS, Senior District Judge.

At all times material plaintiff[1] was a Delaware corporation with its principal place of business in Seattle, engaged in business as a common carrier by water between ports in the Pacific Northwest of the United States and ports in the Orient and Far East.

In this action plaintiff seeks to recover a general average contribution from the government because of a casualty occurring on the SS CANADA MAIL, owned and operated by plaintiff, during the night of January 19th/January 20th, 1970. The government owned certain Military Sealift Command and Department of Agriculture cargo "on board" the vessel at that time.

On January 11, 1970 after loading commercial cargo in Portland, Oregon, and Longview, Washington, the vessel sailed to Puget Sound for the purpose of loading additional cargo destined for various Oriental and Far East ports.

Puget Sound is a landlocked and protected body of water, with numerous channels and branches, extending approximately ninety miles from Olympia on the south to the Strait of Juan de Fuca on the north, the latter providing access to the sea. Tacoma is located south of Seattle, the distance between their respective centers being 33 miles. Both are on the east side of Puget Sound, and they share a large modern airport known as Seattle-Tacoma International Airport located approximately halfway between the two cities. The southern suburban areas of Seattle are contiguous to the northern suburbs of Tacoma, thus forming, in substance, a megalopolis. Travel from one pier in Seattle to one in Tacoma is virtually the same as shifting from one Seattle pier to another, although the distance is somewhat greater.

After entering Puget Sound additional cargo was loaded for Oriental/Far East discharge at the following ports in the order named: Everett, Washington (located north of Seattle, twenty-nine miles between city centers); Tacoma grain dock, Tacoma; Pier 90, Seattle; Tallow Dock, Tacoma; Pier 4, Tacoma; Pier 90, Seattle, and Pier 46, Seattle. The government cargo involved herein was loaded during each of the two stops at Pier 90 in Seattle and at Pier 4, Tacoma.

On January 19, 1970 the CANADA MAIL was at Pier 46, the last shift made by the vessel prior to departure

---

1. On October 1, 1973, American Mail Line, Ltd. was merged into American President Lines, Ltd. The latter assumed all the rights of the former, including the right to assert this claim for general average against defendant. All parties agreed to the litigation proceeding without amending the caption.

for sea and Oriental ports, loading additional commercial cargo. After the loading of this cargo the master of the vessel directed the chief mate to ballast the number 5 after starboard deep tank in order to achieve proper trim. The latter directed the carpenter to remove the gooseneck vent from the vent pipe leading into the deep tank from the main deck. The chief engineer then inserted a fire hose into the vent pipe for the purpose of filling the tank with fresh water from a shore hydrant. Shortly thereafter, at about 1500 hours the third mate checked and confirmed that the proper tank was being filled.

The chief mate, following his usual practice of ballasting, removed the cover to the manhole access to the deep tank. His purpose in so doing was to allow a visual inspection of the water flow until the filling was nearly completed, at which time the cover would be replaced. He did not watch over the ballasting, however, but placed the engine department in charge. By so doing he created a situation dangerous to the cargo as the engine department followed a procedure different than that of the chief mate, that of sealing the cover. With the tank cover sealed, water would flow onto the deck through the vent pipe after it reached the top of the tank and not into the cargo compartments.

The water was turned off at about 0400 hours January 20th. At about 0820 hours of the same day, during a routine inspection of the holds, seven feet of water was discovered in number 5 lower hold, this being the only inspection since the third mate made the aforementioned examination. The engineers had erroneously assumed the chief mate had followed the procedure used by the engine department and had sealed the tank cover instead of leaving it off to permit visual inspection.

The water in number 5 lower hold moistened woodpulp which had been tightly stowed. Since woodpulp expands in all directions when moistened, it was necessary to discharge cargo from number 5 lower hold and 'tween deck to relieve the pressure on the vessel's structure, allow expansion of the cargo to its full extent and to examine the various structural parts of the lower hold for damage.

Plaintiff declared a general average as a result of the flooding.

The contracts of carriage between the parties provided that general average shall be adjusted, stated and settled, according to York-Antwerp Rules 1950 and they contained the usual Amended Jason Clause.[2]

The sole issue in this case is whether plaintiff, as carrier, is responsible. This, in turn, involves two subsidiary questions: (1) whether the damage occurred before the beginning of the voyage, with respect to each shipment from which contribution is sought; (2) whether the CANADA MAIL was unseaworthy, or the holds unfit, and if so, whether there was a failure to exercise due diligence with respect to either.[3]

---

2. "In the event of accident, danger, damage, or disaster, before or after commencement of the voyage resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequences of which, the *carrier is not responsible*, by statute, contract, or otherwise, the goods, shippers, consignees, or owners of the goods shall contribute with the carrier in general average to the payment of any sacrifices, losses, or expenses of a general average nature that may be made or incurred, and shall pay salvage and special charges incurred in respect of the goods." [Emphasis added]

3. 46 U.S.C. § 1304(1): Neither the carrier nor the ship shall be liable for loss or damage arising or resulting from unseaworthiness unless caused by want of due diligence on the part of the carrier to make the ship seaworthy, and to secure that the ship is properly manned, equipped, and supplied, and to make the holds, refrigerating and cool chambers, and all other parts of the ship in which goods are carried fit and safe for their reception, carriage, and preservation in accordance with the provisions of paragraph (1) of section 1303 of this title. Whenever loss or damage has resulted from unsea-

■ From the loading of the cargo to the beginning of the voyage the shipowner has the obligation to use due diligence as specified in Sec. 3(1) of COGSA, 46 U.S.C. § 1303(1).[4] Plaintiff seeks to apply the "voyage by stages" doctrine, thus claiming that from the time of departure from Everett until arrival at Pier 46, Seattle, the vessel "broke ground" and commenced her voyage to Oriental/Far Eastern ports on six separate occasions. I do not agree. This is not a case of plaintiff providing transportation of cargo between Puget Sound ports. All shifts mentioned herein were merely preparatory for the ultimate voyage from Pacific Northwest ports to Oriental/Far Eastern ports.

In loading a vessel for such a voyage it is necessary to plan and make allowance for the trim of the vessel and the discharge of cargo at the ports of destination in the order of call. These considerations necessitated the shifts. At one time a general breakbulk ship laid at a specified pier and the cargo moved to the vessel by surface transportation or by lighter. By reason of modern shore facilities, vessels and methods, as well as stiff competition, however, it is now more practical and feasible for such ships to go to the cargo. The various shifts from Seattle to Tacoma were not voyages but merely steps in the process of preparing for the ultimate voyage.[5] Accordingly, I am of the view that the water entered number 5 lower hold "before * * the beginning of the voyage" within the meaning of 46 U.S.C. § 1303(1).

Expenses for which contribution in general average is sought were necessitated by improper ballasting. In particular, there was a failure to stop the flow of water upon it reaching the top of the tank, and a failure to have a uniform procedure understood by the deck and engine room departments for the ballasting of tanks.

■■ Unseaworthiness is not limited to a defective condition of a physical part of the ship itself.[6] The failure to have standardized the ballasting of tanks rendered the vessel unfit for her intended service. It created an unreasonable risk of damage to cargo. The shipowner's failure to establish such a

---

worthiness, the burden of proving the exercise of due diligence shall be on the carrier or other persons claiming exemption under this section.

46 U.S.C. § 1303(1): The carrier shall be bound, before and at the beginning of the voyage, to exercise due diligence to—
(a) Make the ship seaworthy;
(b) Properly man, equip, and supply the ship;
(c) Make the holds, refrigerating and cooling chambers, and all other parts of the ship in which goods are carried, fit and safe for their reception, carriage, and preservation.

4. Mississippi Steamship Co. v. Zander and Co., 270 F.2d 345, 349 (5th Cir., 1959), (vacated on grounds of mootness), 361 U.S. 115, 80 S.Ct. 212, 4 L.Ed.2d 148 (1959).

5. Cf. (Voyages had not commenced in the following) Bowring v. Thebaud, 56 F. 520 (2nd Cir., 1892) (vessel hauled from one dock to another within New York Harbor); Gilchrist Transp. Co. v. Boston Ins. Co., 223 F. 716 (6th Cir., 1915) (after being partly loaded, vessel moved 7 miles away in the same harbor, but it had not been inspected, was not made ready to sail, and the lake had not sufficiently cleared of ice to permit safe passage); The Willowpool, 12 F.Supp. 96 (S.D.N.Y., 1935), aff'd, 86 F.2d 1002 (2nd Cir., 1936) (having finished loading, vessel left wharf but moored in harbor rather than directly putting to sea); Isbrandtsen Co. v. Federal Ins. Co., 113 F.Supp. 357 (S.D.N.Y., 1952), aff'd, 205 F.2d 679 (2nd Cir., 1953), cert. denied, 346 U.S. 866, 74 S.Ct. 106, 98 L.Ed. 377 (1953) (vessel in Pearl Harbor forced to vacate its berth to a Navy vessel, moved 7 miles away to await clearance to depart the customs district); American Agr. Chemical Co. v. O'Donnell Transp. Co., 62 F.Supp. 239. (S. D.N.Y., 1945) (barge shifted by hand from one dock to another dock "a little further along the river" prior to the intended voyage from Buffalo to New York).

6. Usner v. Luckenbach Overseas Corp., 400 U.S. 494, 499, 91 S.Ct. 514, 27 L.Ed.2d 562 (1971).

uniform method violated Sec. 3(1) of COGSA, 46 U.S.C. § 1303(1).

Even though the failure to stop the flow of water upon reaching the top of the tank be an error in management for which the shipowner would not be responsible had it occurred after the commencement of the voyage,[7] the same error may be a lack of due diligence on the part of the shipowner to make the vessel seaworthy when such conduct occurs before the beginning of a voyage.[8] The existence of such an error in management does not vitiate the unseaworthiness and absolve the shipowner of responsibility.[9] Furthermore, the entry of water into number 5 lower hold manifested plaintiff's failure to exercise due diligence before the beginning of the voyage to make the holds fit for the preservation of cargo.[10]

I am also of the view that even if the voyage had commenced at the times plaintiff contends, the claim would still fail. The unseaworthiness created by the lack of a uniform ballasting procedure resulted from a want of due diligence by plaintiff and prior, I believe, to the commencement of the several stages of its contended voyage.[11] I do not rest my decision solely on this basis, however, as it was not urged by the parties and to do so I must draw an inference as to the duration of the dual ballasting practice which may not be justified from the admitted facts.

The complaint is dismissed. This opinion shall constitute the court's findings of fact and conclusions of law pursuant to F.R.Civ.P. Rule 52(a), and defendant may present a decree in accordance herewith.

7. Leon Bernstein Co. v. Wilhelmsen, 232 F. 2d 771 (5th Cir., 1956); *Cf.* General Foods Corp. v. The Mormacsurf, 276 F.2d 722 (2nd Cir., 1960), cert. denied, 364 U.S. 822, 81 S.Ct. 58, 5 L.Ed.2d 52 (1960).

8. The Newport, 7 F.2d 452 (9th Cir., 1925).

9. Hydaburg Cooperative Ass'n v. Alaska Steamship Co., 404 F.2d 151, 153 (9th Cir., 1968).

10. A Knauth, The American Law of Ocean Bills of Lading 202 (4th ed. 1953); 46 U.S. C. § 1303(1)(c).

