**INDIAN TOWING COMPANY, Inc., Upper Mississippi Towing Corporation, Minnesota Farm Bureau Service Company and United Firemen's Insurance Company**

v.

**UNITED STATES of America.**

**INDIAN TOWING COMPANY, Inc., Upper Mississippi Towing Corporation, Lester F. Alexander, Leslie B. Durant, Wiley F. Wroten and William E. Padel, dba United Marine Company, United Firemen's Insurance Company and General Insurance Company of America**

v.

**UNITED STATES of America.**

Civ. A. Nos. 3667, 4104.

United States District Court
E. D. Louisiana,
New Orleans Division.

Oct. 8, 1959.

Richard B. Montgomery, Jr., Henry J. Read, John P. Hammond, New Orleans, La., for plaintiff.

M. Hepburn Many, U. S. Atty., Kathleen Ruddell, Asst. U. S. Atty., New Orleans, La., John P. Obarski, Legal Officer, 8th Coast Guard Dist., New Orleans, La., for defendant.

CHRISTENBERRY, Chief Judge.

The foregoing matters having been consolidated for trial, and having been tried to the Court without a jury, the Court having heard evidence and the arguments of counsel and having taken time to consider the matters, hereby makes the following Findings of Fact and Conclusions of Law:

### Findings of Fact

1. Indian Towing Company, Inc., is a corporation organized and existing under the laws of Louisiana, and on or about October 1, 1951, and at all times material hereto, was the owner of the Tug Navajo.

2. United Marine Company is a Louisiana partnership composed of Lester F. Alexander, Leslie B. Durant, Wiley

F. Wroten and William E. Padel, and on or about October 1, 1951, and at all times material hereto, was the owner of the Barge AS-16 which was under charter to Upper Mississippi Towing Corporation.

3. Upper Mississippi Towing Corporation is a corporation organized and existing under the laws of Minnesota, and on or about October 1, 1951, and at all times material hereto, had a towage contract with Indian Towing Company pursuant to which the Tug Navajo was to tow the Barge AS-16 from Tampa, Florida, to New Orleans, Louisiana.

4. Minnesota Farm Bureau Service Company is a corporation organized and existing under the laws of Minnesota, and on or about October 1, 1951 and at all times material hereto, owned a cargo of triple super phosphate aboard the Barge AS-16.

5. United Firemen's Insurance Company is a corporation organized and existing under the laws of New York, and on or about October 1, 1951 and at all times material hereto, was the insurer of the cargo of triple super phosphate aboard the Barge AS-16.

6. The General Insurance Company is a corporation organized and existing under the laws of Washington, and on or about October 1, 1951 and at all times material hereto, was the hull insurer of the Barge AS-16.

7. The United States of America through the United States Coast Guard, on or about October 1, 1951, and at all times material hereto, owned, maintained and operated an Aid to Navigation identified as Chandeleur Light situated near the NW end of the northernmost of the Chandeleur Islands, Gulf of Mexico, approximately 22 miles in a straight line and 26-27 miles by boat from Gulfport, Mississippi, the location of the nearest manned Coast Guard shore station. The light itself was atop a 99-foot structure and had a visibility of 16 miles in clear weather. It was automatic in operation, and drew its power from a bank of storage cells, totaling 32 volts. A component element of the system was a sun relay switch or unit by which the light was caused to function only during hours of darkness.

8. In 1949 when the light was made electric and automatic in operation, its resident personnel was discontinued. Primary responsibility for its maintenance and operation was assigned the Gulfport Light Attendant Station, Gulfport, Mississippi, which also had such responsibility for approximately 55 other lighted aids to navigation. At that time and subsequently through October 1951 and to the date of trial, instructions for the inspection and maintenance of Chandeleur Light called for a check of the component elements at least once every thirty days, which inspection included a check of the functioning of the whole by artificially darkening the sun relay unit, thus causing the light to come on, if all were in working order.

9. Shipping interests and the public generally were notified of the unmanned status through "Local Notice to Mariners No. 107" of 1949. All published light lists subsequent to 1949 have designated the Chandeleur Light as unmanned and this was shown in the 1951 Light List by the symbol "U", which was defined:

"U after the name of the light indicates the light is unwatched. All lighted buoys are unwatched. Unwatched lights may become irregular or extinguished although such apparatus have a high degree of reliability."

10. The Navajo was a pilothouse-controlled single screw 900 HP Diesel propelled steel hull vessel of 88 foot length, 22 foot beam and 8½-9 foot draft. On or about October 1, 1951, and at all times material hereto, her personnel consisted of a captain, a mate, two engineers, two deckhands and a cook. She was equipped with a radio, a radio direction finder and a standard magnetic compass, but had no radar and her fathometer was inoperative. She had aboard the charts of the Gulf Coast area, the Light Lists and

some other navigational publications, but did not have Tide and Current Tables.

11. The AS–16 was an unmanned steel barge of 190 foot length, 40 foot beam, and 9½ foot draft. During the voyage here involved she was fully loaded with triple super phosphate, and from the time of departure from Tampa Bar to her grounding she was towed astern the Navajo at the end of a 800–900 foot manila hawser.

12. The Navajo and her tow departed Tampa Bar at 10:00 p. m. September 28, 1951, going directly in open water to her landfall off Sand Island Light at the entrance to Mobile Bay, reaching a position approximately 5 miles off the light at 6:00 p. m. September 30, 1951, having averaged 7 knots for the 311 mile distance. She then proceeded westerly and parallel to the coast to a point approximately 5–6 miles abeam of the Horn Island Light, reaching this position at 9:20 p. m. September 30, 1951, and having averaged 6.9 knots for the 23 mile distance. The wind at this time was approximately 30–35 miles per hour, waves were approximately 5–6 feet and visibility not more than 10 miles. Her master, who regularly had the 6 to 12 watch, was at the conn.

13. After leaving the position abeam Horn Island Light, the master followed a compass course of 268° magnetic intending to make good an actual course of 265° magnetic. Wind and sea conditions continued substantially the same, but visibility gradually lessened. The 3° allowance of course set over course intended was to compensate for the northeast wind, the effect of which the master thought would be substantially reduced by a tide continuing on the flood during this time. Actually, however, as he could have determined from tide tables if they had been aboard, the tide did not continue on the flood for this period, but went to the ebb on or before 10:30 p. m. on the night of September 30th–October 1st, 1951. With weather conditions such as existed at that time, a tidal flow of up to four knots could have been reasonably anticipated. The Navajo, then past Horn Island Light and on her way toward Ship Island Pass, was thus strongly set to the south by both wind and tide, which were now cumulative in effect.

14. The master was to be relieved at 12 o'clock midnight by the mate who was assigned the 12 to 6 watch. Between 11:30 p. m. and 12 midnight, prior to his time to take over, the mate attempted to ascertain the position of the Navajo and her tow and found that the master did not know "where he was at". No fixes of any kind had been obtained by the master in the two hours and fortynine minutes since leaving Horn Island. Accordingly, the mate refused to relieve the master of the conn.

15. The master remained at the conn, and despite being lost, continued on the same compass course and the same speed until he ran aground at 12:-20 a. m. October 1, 1951, less than a mile from the northernmost tip of Chandeleur Island. From the time she left her position abeam Horn Island until the time of the grounding the Navajo had averaged 6.53 knots for the distance of 19.6 miles.

16. With an inoperative fathometer, the Navajo could determine the depth of the water she was in only by taking soundings with a hand lead line. These, to be accurate and reliable, must be taken at dead slow speed, which with a tug and tow, such as the Navajo and the AS–16, requires a slowing and regaining speed that costs 10–15 minutes in lost time. The Navajo could not have taken more than one or possibly two such soundings and maintained her average speed of 6.53 knots between her Horn Island fix and her grounding.

17. At the time of grounding visibility had been reduced to 4–5 miles. The course actually made good from the Navajo's position off Horn Island to her grounding was 253° magnetic. A course of 265° magnetic, such as her master thought he was on, would have carried the vessel and her tow to the north and outside the then range of visibility of

Chandeleur Light, and he would never have seen it, but would have instead picked up the sea buoy midway between Chandeleur and Ship Islands.

18. With a visibility of 4–5 miles and heading west from his Horn Island fix at an average speed of 6.53 knots, the master of the Navajo should have expected to sight either the sea buoy midway between Chandeleur and Ship Island, or Chandeleur Light itself, not later than midnight, twenty minutes before his grounding. At this point, if he had not identified his position, he had then run out his time. Proper and competent seamanship in such a situation is either to anchor in order to determine position, or to effect a 180° change in direction and go back over the original course. To proceed on with the same course and speed was to invite the disaster that occurred.

19. The Navajo was first to touch bottom, and the master immediately sought to avoid stranding his tug by backing and turning. In aid of this maneuver the mate cut the hawser to the AS–16, setting the barge adrift while still afloat. During or shortly subsequent to this maneuvering, the searchlight of the Navajo which had not been used since leaving Tampa was lighted for the first time, and the crew members were able to see a structure on shore which was identified as the structure of Chandeleur Light. The light itself was not functioning.

20. The barge, set adrift, grounded approximately 1000–2000 feet from the base of the Chandeleur Light structure and the tug proceeded on to Gulfport, Mississippi, without her tow. As a result of the stranding the AS–16 was damaged and her cargo damaged and/or lost.

21. The Tug Navajo on October 1, 1951 and at all times material hereto, was inadequately equipped, unseaworthy and unfit for safe navigation of the waters surrounding Chandeleur Island in that she did not have aboard tide and current tables in an area characterized by strong and abruptly changing tidal currents, and in that her fathometer was inoperative in an area of shoal waters and low, sandy islands of limited visibility.

22. The Tug Navajo was in charge of and being navigated by a master who was careless, incompetent, negligent and at fault in the following particulars:

(a) He placed absolute reliance on an unmanned and unwatched light.

(b) He made inadequate and improper allowances for tide, wind and weather conditions.

(c) He did not properly consult or use such navigational aids, facilities and equipment as the Navajo did carry.

(d) He continued under way at the same course and speed despite having run his time out on his expected sighting if he had been on his dead reckoning course.

(e) He continued under way at the same course and speed despite not knowing his position.

(f) He continued into shoal waters, not knowing the depth, and taking insufficient and/or unreliable soundings.

(g) He ran his vessel and her tow aground on a well known and fully charted body of land.

23. The stranding of the AS–16 with the resultant damage to the hull of the barge and the damage and/or loss of her cargo was caused proximately by the unsafe, unfit and unseaworthy condition of the Tug Navajo, and particularly her inadequate and improperly maintained navigational aids, facilities and equipment; and by the gross carelessness, incompetence, negligence and fault of her master as set out above.

24. The Coast Guard had no notice from any source of the failure of Chandeleur Light prior to approximately 10:30 p. m. October 2, 1951. At that time the Coast Guard Cutter Nike, returning to station in Gulfport from patrol off Campeche, Mexico, having failed to pick up the loom of the light off the Chandeleur Islands, had anchored and determined that the light was not functioning. She forthwith radioed this information to

the Coast Guard District Office in New Orleans, which in turn immediately sent out a broadcast to all shipping interests and the public generally, notifying them that the light was extinguished.

25. The Coast Guard used all means reasonably available to it in discovering that Chandeleur Light was out, and gave immediate warning by radio and publication of the fact of the extinguishment of the light to all shipping interests and the public generally.

26. At the same time the Coast Guard District Office broadcast warning that Chandeleur Light was extinguished, the Coast Guard Cutter Salvia was dispatched to correct the non-functioning of Chandeleur Light. She arrived off Chandeleur Islands the following morning, October 3, 1951, and succeeded in relighting the light in the afternoon of that day. The fact of relighting was immediately broadcast to all shipping interests.

27. The Coast Guard, after discovery that Chandeleur Light was out, acted with all possible speed in repairing and relighting it.

28. In restoring Chandeleur Light to normal operating condition, the party assigned this task from the Salvia checked all component elements of the light system. The sun relay unit was found to be malfunctioning. This unit was removed from its position, at which time its base was found to be partially filled with mud from dirt daubers, a species of wasp, but none of this mud was in the interior part where the silver contact points which make and break the circuit are located. The unit was disassembled and a fine deposit with pitting was found on the contact points. These were cleaned and adjusted, and the unit reassembled, placed back in position, connected and checked. The entire light was then found to function normally.

29. There had been no indication of failure or malfunctioning of the sun relay unit or any other part of the Chandeleur Light system during the entire time between its installation in 1949 and the outage in October 1951. The last regular inspection of the Chandeleur Light had been made on September 7, 1951, approximately three weeks prior to the grounding of the Navajo and its tow. At that time the regular checks were made, including the artificial darkening of the sun relay, and the light operated normally. No irregularities or malfunctioning of any sort were found.

30. The malfunctioning of the sun relay unit, which in turn caused the outage of Chandeleur Light, was not due to the mud in its base, but was due to a failure of the silver contact points, because of pitting, to complete the electrical circuit of the relay system. The cause of this pitting, sufficient to bring about failure in this installation, which had not occurred previously and has not occurred subsequently up to the date of trial, is still not known. As installed in the Chandeleur Light system the unit had a separate 12 volt circuit with a total current flowing through it of .048 amperes, less than 1/30th the maximum safe current permitted by the manufacturer's specifications for this unit of 1.5 amperes at 12 volts.

31. Incipient failure of the contact points cannot be accurately determined by disassembly of the unit and visual inspection, because some darkening and oxidization of the silver occurs in normal use, and some pitted contacts nonetheless complete the electrical circuit, while continuity can be lost in others which superficially appear to be perfectly good.

32. The sun relay unit as used in the Chandeleur Light system is of standard design, having been originally devised by the Swedish scientist, Gustaf Dalen, around the turn of the century and manufactured in something similar to its present state by the same concern, the American Gas Accumulator Company, since 1921 or 1922. It is the most reliable of the light-actuated switches, and when installed in such a station as Chandeleur Light has an anticipated working life without failure of from 20 to 60 years. Its failure on station was

an occurrence that could not have been reasonably foreseen.

33. The Coast Guard used due care to make certain that Chandeleur Light was kept in good working order. The standards set, and the adherence to these standards, show no negligence whatsoever on its part.

34. The casualty complained of was not caused or contributed to by any act or neglect of governmental personnel but was occasioned solely by negligence, fault, carelessness and incompetence in the maintenance and operation of the Navajo and her tow.

## Conclusions of Law

1. This Court has jurisdiction of these actions, and venue is properly laid in the Eastern District of Louisiana. 28 U.S.C. § 1346.

2. Running aground on a well known and fully charted body of land in itself raises a presumption of negligence and fault. The Helen B. Moran, D.C., 255 F. 342; New York Trap Rock Corporation v. The Dynamic, D.C., 50 F. Supp. 507, affirmed 2 Cir., 136 F.2d 683. Not only was this presumption not rebutted by plaintiffs, but negligence and lack of reasonable and due care in the maintenance and operation of the Navajo were affirmatively shown.

3. The Tug Navajo on October 1, 1951 was unseaworthy for the area in which she was being navigated in the following respects: (1) She was in charge of and being navigated by an incompetent master; (2) she did not have tide and current tables, which were necessary navigational information; and (3) her fathometer was inoperative. The Maria, 4 Cir., 91 F.2d 819; The T. J. Hooper, 2 Cir., 60 F.2d 737. Her unseaworthiness was a proximate cause of the stranding, which in turn led to the loss and damage in question.

4. The Tug Navajo and her tow on October 1, 1951 were navigated in a careless, reckless, imprudent and unseamanlike fashion in the following respects: (1) inadequate and improper allowances were made for tide, wind and weather conditions; (2) the same course and speed were maintained despite the fact that her position was unknown; (3) the same course and speed were maintained despite the failure to pick up her sightings; (4) the same course and speed were maintained in shoal waters without taking proper soundings; and (5) from her last known position to her grounding no check or determination of any kind was made to find out if any discrepancy existed between the course actually made good and the course intended to be made good, but instead, absolute reliance for warning in the event of such discrepancy was placed on an unmanned light known to be subject to irregularity or extinguishment. These errors of navigation were a proximate cause of the stranding, which in turn led to the loss and damage in question.

5. The Coast Guard had neither actual nor constructive notice that Chandeleur Light was out on October 1, 1951, and the failure on the part of the Navajo to know that the light was out was not caused by any negligence or lack of due and reasonable care on the part of the Coast Guard. Russell, Poling & Company v. Conners Standard Marine Corp., 2 Cir., 252 F.2d 167.

6. Taking into account its own past experience and the experience of others with the sun relay unit, together with what was inherently probable from the nature of the device itself, the Coast Guard could not have reasonably anticipated the failure on October 1, 1951, of the unit from pitted contact points, which in turn caused extinguishment of Chandeleur Light. The Germanic, 196 U.S. 589, 25 S.Ct. 317, 49 L.Ed. 610; Ford v. Tremont Lumber Co., 1909, 123 La. 742, 49 So. 492, 22 L.R.A., N.S., 917. The bare possibility of such failure is not a basis upon which to predicate a wrong. Brady v. Southern Railway Co., 320 U.S. 476, 64 S.Ct. 232, 88 L.Ed. 239. In maintaining and operating Chandeleur Light as an aid to navigation, the Coast Guard used due and reasonable care in the performance

of its duty. Indian Towing Company v. United States, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48.

7. The damage to the AS–16 and the damage to and/or loss of her cargo growing out of her stranding on October 1, 1951 was not caused or contributed to in any way by any act or neglect of the United States, its agents, servants or employees, and plaintiffs accordingly are not entitled to recovery from the United States.

8. The United States is entitled to judgment in its favor dismissing the complaints herein with costs.