**UNITED STATES of America, Plaintiff,**

**v.**

**ULTRAMAR SHIPPING CO., INC., Aries Marine Shipping Co., and Bankers Trust Co., and the S.S. ULTRAMAR, her Engines, Tackle, Boilers and Appurtenances, Defendants.**

No. 85 Civ. 4549 (CLB).

United States District Court, S.D. New York.

Sept. 1, 1987.

Supplemental Findings and Conclusions Jan. 11, 1988.

Janis G. Schulmeister, David P. Howe, Dept. of Justice, Civil Div., Torts Branch, New York City, for plaintiff.

Chester Hooper, Glenn R. Jones, Haight, Gardner, Poor & Havens, New York City, for defendants.

## FINDINGS AND CONCLUSIONS

"Someday on the Ganges
I'll meet you once more
And I'll kiss you and caress you
Where the waters kiss the silent shore."
From "Moonlight on the Ganges", words by Chester Wallace, music by Sherman Meyers, c. 1926 Campbell Connelly Ltd.

BRIEANT, Chief Judge.

In the moonlight on the morning of June 14, 1984, on the Ganges Delta, the M.V. CHERRY LAJU ran aground, capsized and sank. One seaman perished. Her cargo of wheat, sent by the United States to the people of Bangladesh through the voluntary relief agency CARE ("Cooperative for American Relief Everywhere"), was lost. The United States, as assignee for CARE, brought this action to recover for that loss, estimated at $1,144,388.77.

The Court has subject matter jurisdiction under 28 U.S.C. §§ 1333 and 1345, and has jurisdiction over the defendants. The action was tried to the Court on March 27, March 31 and April 1, 1987, and post-trial memoranda were submitted on August 3, 1987. While our trial record is illuminated largely by moonlight on the Ganges, the following constitutes the findings and conclusions of the Court.

*The Shipment*

In February 1984, pursuant to Title II of the Agricultural Trade Development and Assistance Act of 1954, 7 U.S.C. §§ 1721–1727, the United States donated to CARE 7,021 metric tons of bulk wheat for shipment to Bangladesh as foreign aid. The cargo was consigned from United States West Coast ports to Chittagong and Chalna, both ports in Bangladesh, aboard the

S.S. ULTRAMAR, an American flag bulk cargo ship, pursuant to a Contract of Affreightment dated March 26, 1987. The ULTRAMAR was crewed by defendant Aries Marine Shipping Co. and operated by defendant Ultramar Shipping Co., Inc., under a bareboat charter from the owner/trustee defendant Bankers Trust Co. (these vessel interests are referred to collectively as "Ultramar Shipping"). Upon arrival in Bangladesh, foreseeably unable, because of her size and draft, to navigate the Pusur River passage to Chalna, and also unable to reach the wharfs at Chittagong, the S.S. ULTRAMAR transferred its cargo to six smaller ships, among them the M.V. CHERRY LAJU.

Defendants do not contest that they are liable for the loss of 9 tons of wheat which were damaged aboard the S.S. Ultramar and another vessel. However, defendants claim the benefit of the exemption from liability provided in the Carriage of Goods by Sea Act (COGSA), 46 U.S.C.App. § 1303, as to the remaining 7012 tons lost aboard the CHERRY LAJU.

The Contract of Affreightment here was executed on behalf of CARE by its broker Wm. H. Muller Shipping Corporation and on behalf of Ultramar Shipping by its Vice President, Captain Jack Ostromogilisky. The pertinent portions of the Contract of Affreightment provide:

"CARGO: ... Wheat in Bulk

VESSEL: Ultramar ...

\* \* \* \* \* \*

DISCHARGE PORTS: Chittagong and/or Chalna

\* \* \* \* \* \*

FREIGHT RATE: U.S. $65.83 per M.T. [metric tons] ...Full berth terms, both ends ...

\* \* \* \* \* \*

OTHER CONDITIONS: ... If offloading by hand becomes necessary, the vessel owners and/or their agents are responsible for providing labor ...

Cargo to be delivered at discharging ports as per bills of lading....

Any lightening to reach safe draft and berth at discharge ports, to be for owners' account....

Discharge costs from lighters for owners' account."

The grain was lifted by the ULTRAMAR at Portland, Oregon, at Vancouver, Washington, and at Tacoma, Washington, on April 16, 23, and 30, 1984, respectively. The vessel issued three clean on board Bills of Lading for a total of 163,334,263 net pounds of grain. The Bills of Lading state that the cargo was "in apparent good order and condition" and that it was to be delivered to the "Port of Chittagong and/or Chalna." The Bills of Lading incorporated COGSA, 46 U.S.C.App. §§ 1301–15 and applied the well known terms of "Lighterage Clause No. 26 of the 'Centrocon' form of charter-party." This lighterage clause provides:

"*Insufficient Water at Discharging Port.* Should the Steamer be ordered to discharge at a place to which there is not sufficient water for her to get the first tide after arrival without lightening, and lie always afloat, lay days are to count from 48 hours after her arrival at a safe anchorage for similar vessels bound for such place and any lighterage incurred to enable her to reach the place of discharge is to be at the expense of the Receiver of the Cargo, any custom of the port or place to the contrary notwithstanding, but time occupied in proceeding from the anchorage to the port of discharge is not to count."

The Contract of Affreightment and Bills of Lading establish that the parties contemplated that, except for lighterage, the transportation of the cargo was to be accomplished solely by the Ultramar. If the Ultramar was compelled to discharge before reaching the place of discharge at the ports of destination, the cargo could be delivered by lighters at the expense of Ultramar Shipping. No mention is made of any other form of multimodal transport. The documents do not distinguish between delivery to Chittagong or to Chalna.

It was clear to the participants that lighterage would be required to discharge the

wheat at Chalna. That port is located on the Pusur River, some 66 miles from the delta of the Ganges and the controlling depth for the port was 24.7 feet. The ULTRAMAR had a draft of more than 45 feet on departure from Tacoma.

*The Voyage*

The Ultramar sailed from Tacoma for Bangladesh on May 1, 1984 and arrived at an anchorage off Bangladesh on May 26, 1984. Due to her length of 896 feet and her maximum loaded draft of 45 feet eleven inches, the ULTRAMAR could not enter the arms of the Ganges leading to Chittagong or Chalna. Thus, as permitted by the Contract of Affreightment, the ULTRAMAR anchored in the Bay of Bengal and transferred her cargo to smaller vessels to effect delivery to Chittagong and Chalna.

For this operation, defendants hired the CHERRY LAJU and five other vessels under a "Lightering and Bagging/Discharge Agreement" dated May 27, 1984, between Ultramar Shipping and Bengal Shipping Line, Ltd. Neither the United States nor CARE was a party to that agreement. The other lighters hired were the PENTA–Y, the BENGAL STAR, the HIGH SEA PRIDE, the REUNION, and the INDIAN GLORY. The CHERRY LAJU was to deliver grain to the port of Chalna, a journey which entailed navigating a narrow river channel and crossing a sand bar.

The "Lightering and Bagging/Discharge Agreement" between Ultramar Shipping and Bengal Shipping provided in relevant part:

"The Contractor [Bengal Shipping] agrees, at his own risk and expense to perform the lightering and bagging/discharging obligations of carrier [Ultramar Shipping].... Contractors shall have the benefit of carrier's right under the said Booking Note and Bill(s) of Lading and shall be bound by all Carrier's obligations only so far as such mutual rights and obligations pertain solely to the lightering and Bagging/Discharging at the designated port(s)/berth(s) and delivery of the cargo to consignee from the lightening vessels...." (Ex. P).

The CHERRY LAJU was a sea going general cargo vessel of Singapore registry. Because her capacity plan was lost, the Court relies on the capacity plan of the sister ship SVEND MAERSK. Although plaintiff has demonstrated some inconsistency between the SVEND MAERSK diagrams and statements regarding the tonnage and draft of the CHERRY LAJU, the testimony at trial established by a preponderance of the evidence that the SVEND MAERSK plan is an accurate representation of the dimensions and specifics of the CHERRY LAJU at the time she performed the transfer operation. (Boyle, Tr. 272–276).

The CHERRY LAJU was not fitted to carry bulk grain according to International Regulations. As a lighter she was not bound by those regulations. However, the Court notes the relevance of the requirements of the International Convention for the Safety of Life at Sea (SOLAS) to which the United States, Bangladesh and Singapore are signatories. (Ex. 23, 30, 30A). The SOLAS Conventions

"represent a uniform set of internationally recognized navigational rules and thus they have the status of general maritime law. Indeed, Professors Gilmore and Black have noted that 'the more competent [ship officers] have most of the [rules] substantially committed to memory.' G. Gilmore & C. Black, The Law of Admiralty 489 (2d Ed.1979)."

*Alkmeon Naviera, S.A. v. M/V Marina L,* 633 F.2d 789, 793 (9th Cir.1980).

The pertinent guidelines of the SOLAS Conventions of 1960 and 1974 require that bulk grain in partly filled compartments be trimmed level and be held down by strapping, lashing, or overstowing with bagged grain or other suitable cargo, that filled compartments be fitted with shifting boards or "saucers," and that throughout the voyage the ship maintain a certain level of stability as determined by a special formula, discussed below.

The CHERRY LAJU loaded alongside the ULTRAMAR by "vacuvator" hose under the supervision of Captain Muhammed E. Sobhan of Bengal Shipping, acting on

behalf of the defendants. (Ex. P and NN). The master of the CHERRY LAJU, Captain Fermin F. Guerrero, had never carried grain before. The loading left a void space of at least 18 inches on the top of the cargo. (Boyle, Tr. 238; Sammis, Tr. 296). The grain was not trimmed by hand, although an effort was made to do so by moving the vacuvator hose. When the CHERRY LAJU finished loading on June 11, 1984, the number 1 hold was only partially full. Holds 2 through 5 were full or nearly so. (Ex. D). No shifting boards were installed and the cargo was not strapped down nor covered with bagged grain. After loading, the CHERRY LAJU had a 3.5 degree list to port. On June 12, she took seawater ballast to starboard to offset the list, and then entered Chittagong and took on about 30 tons of diesel fuel. (Ex. NN). She completed bunkering at 1820 according to the ship's log. (Ex. NN).

Early in the morning of June 13, 1984, the Eastern Inspection & Testing Company Ltd. conducted a draft survey of the CHERRY LAJU to compute or verify the amount of wheat lifted. This survey found her draft to be 24 feet 6 inches in fresh water. (Ex. 16). According to the survey, the forward draft and the after draft were the same, 24 feet 6 inches, signifying that the CHERRY LAJU was in essentially even trim. The Court finds this third-party report entitled to great weight, as its purpose at the time it was made was solely to determine through water displacement the amount of grain lifted on the CHERRY LAJU.

Testimony was presented regarding the CHERRY LAJU's stability after loading, as represented by her metacentric height or "GM." The lower a ship's GM, the more she will roll. (Kimball, Tr. 102–103). The minimum allowable GM for the CHERRY LAJU under the SOLAS formula was 3 feet 7 inches. (Ex. 27 and 27a; Kimball, Tr. 228). After engaging in numerous, often contradictory calculations, Mr. Kimball finally calculated the GM for the CHERRY LAJU at the time of the voyage to range between 1.47 and 1.61 feet. (Tr. 272). Similarly, Captain Edward P. Boyle of the National Cargo Bureau, another witness

for defendants, stated in his report (Ex. CC) that "I would guess [sic] that the [CHERRY LAJU] would not comply with the stability requirements of SOLAS 1974."

*The Voyage to Chalna*

The Ganges Delta had recently entered the monsoon season when the CHERRY LAJU sailed from Chittagong for Chalna at about noon on June 13, 1984. According to the deck log of the S.S. ULTRAMAR (Ex. Q), the seas were heavy with swells and the bay was under a cloud cover. Both Captain Sobhan and Captain Guerrero were familiar with the entrance to Chalna and the foreseeable sea conditions at the Chalna sand bar were also known to defendants. In Captain Sobhan's experience, swells of 10 to 15 feet and seas of 7 to 8 feet at the bar were "typical" during the southwest monsoon season. (Sobhan Deposition, at 23, 103, 128). Nevertheless, the stability of the CHERRY LAJU and the manner of its stowage were questionable and its fathometer was inoperable, as it had been for over a year. The only sailing directions on board for Chalna were written in French, which none of her officers could read. Those directions contained a warning that a vessel would need a clearance of not less than 1.2 meters (4 feet) under the keel when crossing the Chalna bar. The CHERRY LAJU did have on board the British Admiralty chart 732 (Ex. DD), which was probably outdated because of the constantly shifting sands for which the delta area was well known, and a copy of the Anticipated Draft Chart for vessels entering Chalna, published by the Bangladesh government. (Ex. GG).

The CHERRY LAJU arrived at the Chalna fairway buoy at the mouth of the Pusur River at 6:00 a.m. on June 14, 1984. (Ex. NN). The port of Chalna is located about 66 miles upstream on the Pusur River from the fairway buoy. Between Chittagong and the Chalna fairway buoy the CHERRY LAJU rolled heavily in southwesterly seas. Captain Guerrero, estimated the seas at 5 to 7 feet and the rolls at 15 to 20 degrees, and described the rolls as "heavy" and "slow." (Ex. 17; Ex. MMM at 7). Notations in the ship's log include "pitching &

rolling, shipping seas all over w/heavy swell, sea rough." The log also notes repeated alterations in the ship's course during the approach to the fairway buoy, which was explained as an attempt to avoid taking seas on deck. (Ex. NN). The Chief Officer estimated the rolls at 15 to 25 degrees as she headed for the fairway buoy. (Ex. 17).

The Bangladesh Anticipated Draft Chart for the months of March to December 1984 (Ex. GG) disclosed that vessels with a draft not exceeding 24 feet 8.4 inches safely could enter Chalna. According to the Eastern Inspection survey, the CHERRY LAJU, when at rest on calm seas was only 2.4 inches within this requirement. When the CHERRY LAJU reached the Chalna fairway buoy, Captain Guerrero spoke with the Hiran Point Pilot Station, the authority responsible for furnishing pilots to guide vessels over the sand bar and through the narrow channel to Chalna. As per instructions from the CHERRY LAJU's agent (Ex. K), Captain Guerrero was to "strictly follow" the instructions of the pilot. Trial testimony confirmed that this was standard procedure. (Boyle, Tr. 280–281, 287–288).

The Pusur River is part of the rapidly changing Ganges River Delta, where an experienced ship master would ordinarily rely on the pilots' local knowledge. The pilots, having this local knowledge and charged with the responsibility to advise in the navigation of vessels in the channel, would have the best knowledge of the area, and would know the maximum safe draft based on previous vessels which passed through safely. (Boyle, Tr. 281, 286–288). And, in fact, within days of the CHERRY LAJU's grounding, the Hiran Point pilot guided across the Chalna bar other vessels with similar drafts engaged in lighterage for the Ultramar: the Penta–Y arrived at Chalna on June 14 with a maximum draft of 25 feet; the High Sea Pride arrived at Chalna on June 16 with a maximum draft of 24 feet 4 inches; the Bengal Star arrived at Chalna on June 26 with a maximum draft of 24 feet 6 inches.

At about 7:30 a.m. on June 14, the CHERRY LAJU passed the Chalna fairway buoy. Captain Guerrero informed the Hiran Point pilot that her draft was 24.7 feet (or 24 feet 8.4 inches), and the pilot told him to proceed. At about 7:50 a.m., when the CHERRY LAJU was between buoys 1 and 2 three miles north of the fairway buoy, Captain Guerrero felt her "bump" three times due to high waves and swells. (Ex. 17). The physics of bumping, that is touching the bottom with the ship's hull, were explained by the witness Kimball, a naval architect, using two diagrams. (Tr. 190; Ex. 28, 29). Every time the CHERRY LAJU rolled her draft increased: 2 feet for a 5 degree roll and 4 feet for a 10 degree roll. With a roll of 15 degrees her draft was about 30 feet 3 inches. In a 25 degree roll her draft was 33 feet. The charted depth of the channel at buoys 1 and 2 was 22 feet. The state of the tide at the time the CHERRY LAJU "bumped" would have added 7 feet 9 inches to the depth for a total depth of 29 feet 9 inches. (Ex. 31). Thus, of necessity and foreseeably rolls of 15 to 25 degrees would have resulted in bumping or contact with or against the bottom.

When Captain Guerrero felt the vessel ground, he first attempted to turn to starboard and return to deeper water. The vessel turned slightly to the right in response to an order for hard right rudder. She then became firmly aground and would go no further. The Captain let go the port anchor to prevent being driven further aground. The seas washed over the vessel's starboard side and broke ventilators, which allowed sea water to enter the vessel. This flooding caused heavy listing to starboard in excess of 25 degrees. (Ex. NN and MMM). As the grain's angle of repose was 23 degrees, at some point during the sinking it must have shifted. The CHERRY LAJU was abandoned with the loss of one crew member, her cargo, and the ship. Many records were lost, although the officers were able to save ship's log. (Ex. NN).

Subsequent to the casualty, a Committee of Enquiry convened by the Bangladesh Ministry of Ports conducted an investigation. The evidence considered and resulting report of the Committee were admitted

at trial, pursuant to F.R.E. 803(8), as Exhibit 17. Although the Committee's factual findings and conclusions are entitled to some weight, this Court is free to make its own independent determination on the issue of causation of this marine casualty.

*The Governing Statutes*

Our resolution of the instant dispute hinges in part on whether the Court should apply the provisions of the Harter Act, 46 U.S.C.App. §§ 190–196, or the Carriage of Goods by Sea Act, 46 U.S.C.App. §§ 1300–1315. Both statutes attempt to strike a delicate balance between the conflicting interests of carriers of goods by sea and shippers. By the law merchant, ocean carriers were held strictly liable for cargo damage or loss which occurred in the course of the conveyance, in part because the shipper was prevented by geographic remoteness from closely supervising the passage of his goods and because he was particularly susceptible to collusion between dishonest carriers and thieves. Carriers responded by insisting that cargo owners accept bills of lading containing exculpatory clauses which essentially negated the carriers' responsibility for cargo. *See generally* 2A *Benedict on Admiralty,* Carriage of Goods by Sea, § 11 (7th rev. ed. 1987).

■ The Harter Act of 1893 attempted to remedy this situation by preserving some of the traditional obligations of carriers but exempting carriers from liability for damage or loss caused by errors in navigation or in the management of the vessel, perils at sea or other navigable waters, acts of God, acts of public enemies, inherent defect of the goods carried, acts or omissions of the cargo owner, injury caused by saving or attempting to save life or property at sea, and seizure under legal process. Section 3 of the Harter Act, 46 U.S.C.App. § 192, provides in relevant part:

"If the owner of any vessel transporting merchandise or property to or from any port of the United States shall exercise due diligence to make said vessel in all respects seaworthy and properly manned, equipped and supplied, neither the vessel, her owner or owners, agent or charterers, shall become or be held responsible for damage or loss resulting from faults or errors in navigation or in the management of said vessel...."

The Supreme Court has interpreted this provision to condition the availability of the various exemptions from liability on a showing that the carrier used "due diligence" to make the vessel seaworthy when she broke ground at the start of the voyage. Regardless of the absence of a causal link between the unseaworthiness and the cargo loss or damage, and even in the context of the exemption for "faults and errors in navigation and management," a carrier is liable under the Harter Act for cargo damage or loss if it fails to carry the burden of proving seaworthiness. *The Isis* [*May v. Hamburg–Amerikanische Packetfahrt Aktiengesellschaft*], 290 U.S. 333, 351, 54 S.Ct. 162, 167, 78 L.Ed. 348 (1933).

■ As a result of dissatisfaction with the Harter Act, Congress in response enacted the Carriage of Goods by Sea Act ("COGSA") in 1936, which in large part superseded the Harter Act. However, the Harter Act remains applicable to coastwise trade, unless the parties agree otherwise. The Harter Act also presently applies during the time period following discharge of cargo from the ship and prior to its delivery; this coverage during the unloading period continues until proper delivery has been made to a fit and customary wharf.

COGSA eases the burden of proof on the carrier, imposed by the Harter Act, by requiring a causal link between a lack of due diligence in assuring seaworthiness of the vessel and the cargo damage or loss. Section 1304 provides:

"Neither the carrier nor the ship shall be liable for loss or damage arising or resulting from unseaworthiness unless caused by want of due diligence on the part of the carrier to make the ship seaworthy, and to secure that the ship is properly manned, equipped, and supplied, and to make the holds, refrigerating and cool chambers, and all other parts of the ship in which goods are carried fit and safe for their reception, carriage, and preservation.... Whenever loss or dam-

age has resulted from unseaworthiness, the burden of proving the exercise of due diligence shall be on the carrier or other persons claiming exemption under this section."

COGSA also greatly expands the list of exemptions from liability designated in the Harter Act, especially in the so-called "(q)" defense exonerating the carrier for liability for loss or damage arising from:

"[a]ny other cause arising without the actual fault and privity of the carrier and without the fault or neglect of the agents or servants of the carrier, but the burden of proof shall be on the person claiming the benefit of this exception to show that neither the actual fault or privity of the carrier nor the fault or neglect of the agents or servants of the carrier contributed to the loss or damage."

46 U.S.C.App. § 1304(2)(q). Significantly, however, COGSA disallows all attempts by carriers to shift the burden of proof to the shipper and prohibits the use of additional exculpatory clauses in bills of lading and other shipping documents.

█ Defendants here maintain they are entitled to COGSA's greater opportunity for exoneration, arguing that the transfer of cargo from the ULTRAMAR to the CHERRY LAJU was not a discharge from the ship's tackle to a lighter, but rather a continuation of the original ocean voyage, and thus COGSA remained in effect. If the Court deems the ULTRAMAR's unloading to the CHERRY LAJU a discharge of cargo, then the Harter Act governs liability for the loss occurring in transit from the carrying vessel ULTRAMAR to the wharf at Chalna. This issue was the source of much contention at trial. The parties framed the issue in terms of lighterage, that is, transportation of cargo between a vessel and the wharf. The "tackle to tackle" coverage of COGSA extends only up until discharge, and unloading into lighters is considered discharge in most circumstances. Thus, losses incurred in the course of lighterage are ordinarily subject to the Harter Act.

█ The Government contends that the CHERRY LAJU was engaged in lighterage for the ULTRAMAR regardless of her size and her ability to navigate on the open seas; she was hired by ULTRAMAR Shipping to transport grain to shore because the ULTRAMAR was too heavy and low in the water to make the river passage to Chalna (hence, the term "lightering"). The Contract of Affreightment, in anticipation of operations such as that involving the CHERRY LAJU, referred to the procedure as "lightening" and the Bills of Lading contained a lighterage clause. The agreement between Ultramar Shipping and Bengal Shipping was titled a "Lightering and Bagging/Discharge Agreement" and, according to Captain Ostromogilisky, Vice President of Ultramar Shipping, the agreement granted Bengal Shipping the unilateral right to select the vessels to be used. (Tr. 56). Captain Ostromogilisky referred to the CHERRY LAJU as a lighter consistently throughout his trial testimony, stating that the size of the vessels used for lighterage at Chittagong and Chalna was dictated by economics and that the CHERRY LAJU fit the description of a lighter under the Lightering and Bagging/Discharge Agreement. (Ostromogilisky, Tr. 56–57, 65–69).

Defendants insist that although it looks like lighterage, sounds like lighterage, and even calls itself lighterage, the voyage of the CHERRY LAJU was a continuation of the ULTRAMAR's voyage to Chalna and the parties intended the "tackle to tackle" journey to require more than one ship. There is no support in the record for this interpretation of the Contract of Affreightment.

Defendants further contend that the Court should look beyond the lighterage terminology used in the various shipping documents to describe the CHERRY LAJU's voyage, and should "examine the actual function performed by the vessel in question together with the circumstances surrounding the transportation of the cargo." (Post-trial memoranda of Ultramar Shipping, at 58). Somewhat inconsistently, defendants also argue that, regardless of the circumstances, lighterage is properly never more than a mere shuttle between

ship and dock and that the CHERRY LAJU's 200 mile trip from the anchorage in the Bay of Bengal, where the ULTRAMAR concluded her voyage, to Chalna may not be termed lighterage. Defendants cite no case which holds that an oceangoing ship used as a lighter should not be treated as one, merely because of the distance traveled or because of her size or capability to perform an oceangoing commercial voyage. In fact, according to decisions cited by plaintiff, other ships as large or larger than the CHERRY LAJU operating in the Bay of Bengal have been recognized as lighters. *United States v. T/S Overseas Joyce,* 1981 A.M.C. 971 (S.D.N.Y.1980); *Embassy of Pakistan v. Overseas Oil Carriers, Inc.,* S.M.A. no. 1006 (arbitration at New York, 1976); *A/S Falkefjell v. Grainvacs, Inc.,* S.M.A. no. 943 (arbitration at New York, 1975).

The Court finds that the actual function of the CHERRY LAJU was lighterage, consistent with the function the parties anticipated she would fulfill. The circumstances surrounding the transportation of cargo from the Ganges River Delta to any of its estuary ports include treacherous channels, mud flats and sand bars and a constantly shifting sea bottom. Controlling depths at Chalna and many other Ganges ports prohibit large oceangoing vessels such as the ULTRAMAR from entering. Such vessels must anchor and discharge a significant distance from the point of delivery. For this reason, the ULTRAMAR's Contract of Affreightment and Bills of Lading did not require discharge to a specific port or to both Chittagong and Chalna, but permitted discharge to "Chittagong and/or Chalna," clearly contemplating anchorage and discharge in the Ganges delta area accessible to both ports. Customary with this type of discharge, lighters were employed to undertake the actual delivery.

In the case of the ULTRAMAR, six lighters were hired, some of which made more than one trip. The numerosity of the vessels employed and the lightering trips required refute defendants' argument that the CHERRY LAJU's carriage was merely the last leg of an international voyage, with discharge occurring when she reached Chalna. Such an interpretation would require conceptualizing the final stage of the grain shipment as splintered into numerous legs, with numerous corresponding points of discharge—an improbable conclusion.

Thus, the Court finds and concludes that discharge occurred when the stevedore unloaded the wheat from the ULTRAMAR into the CHERRY LAJU and the other five vessels. Accordingly, this Court concludes that the Harter Act controls the obligations of defendants during the period between discharge from the ULTRAMAR and delivery at Chalna. This view is consistent with the decision in *Isthmian Steamship Co. v. California Spray–Chemical Corp.,* 290 F.2d 486, 488–89 (9th Cir.1961), in which the Court applied the Harter Act to lighterage between Alexandria, Egypt and quays at which deep draft vessels such as the carrier's could not dock. *See also Central Trading Co. v. M.V. Dong Myung,* 361 F.Supp. 302, 304 (S.D.N.Y.1973) (Knapp, J.).

■ The Court also rejects the contention that COGSA applies to this casualty because the Bills of Lading incorporate the statute by reference. Even when COGSA does not apply *ex proprio vigore* to a contract of carriage, the parties may incorporate it as a contract term. However, where the Harter Act would ordinarily apply to an event, it forbids and nullifies all contractual terms which broaden a carrier's immunities and defenses beyond those granted by the act itself. 46 U.S.C.App. § 190. Because invoking COGSA to limit defendants' duties after discharge to the CHERRY LAJU but before delivery to Chalna broadens defendants' defenses, it is forbidden by the Harter Act. *Caterpillar Overseas, S.A. v. S.S. Expeditor,* 318 F.2d 720, 722–23 (2d Cir.), *cert. denied,* 375 U.S. 942, 84 S.Ct. 347, 11 L.Ed.2d 272 (1963).

*The Burden of Proving Seaworthiness*

Under the Harter Act, once the shipper establishes a *prima facie* case, the carrier is liable for all cargo loss or damage unless it proves seaworthiness *and* the applicability of one of the act's excepted causes. The

shipper establishes a *prima facie* case by showing the good condition of the cargo at the time of delivery to the carrier, as evidenced by the issuance of a clean bill of lading, and failure of delivery at the destination in the same good order and condition. *Caemint Food, Inc. v. Brasileiro*, 647 F.2d 347, 352 (2d Cir.1981). The shipper is not required to show that the carrier was at fault, nor to explain how the loss occurred. *Nissho–Iwai Co., Ltd. v. M/T Stolt Lion*, 617 F.2d 907, 912 (2d Cir.1980); *Vana Trading Co., Inc. v. S.S. Mette Skou*, 556 F.2d 100 (2d Cir.), *cert. denied*, 434 U.S. 892, 98 S.Ct. 267, 54 L.Ed.2d 177 (1977).

■ As a *prima facie* case has been established here, the burden shifts to defendants to prove that they exercised due diligence to assure that the vessel was seaworthy at the start of the voyage, and that the loss arose out of an excepted cause. In the instant case, defendants argue that the CHERRY LAJU was made seaworthy and that the exception for error in navigation applies. Defendants argue that the casualty resulted from either the master's negligence or the pilot and port authority's wrongful acts which enticed the master to attempt a dangerous passage.

■ The carrier's duty of due diligence to make the vessel seaworthy is a condition precedent to its enjoyment of any of the Harter Act's exemptions. *Isbrandtsen Co. v. Federal Ins. Co.*, 113 F.Supp. 357 (S.D.N.Y.1952), *aff'd*, 205 F.2d 679 (2d Cir.), *cert. denied*, 346 U.S. 866, 74 S.Ct. 106, 98 L.Ed. 377 (1953). The duty to exercise due diligence is not *pro forma;* the carrier is held to a high standard of care. *Peter Paul, Inc. v. Rederi A/B Pulp*, 258 F.2d 901 (2d Cir.1958), *cert. denied*, 359 U.S. 910, 79 S.Ct. 586, 3 L.Ed.2d 574 (1959); *Gold Dust Corp. v. Munson S.S. Line*, 55 F.2d 900 (2d Cir.1932). This duty relates specifically to the inception of the voyage and applies to each vessel participating in the carriage.

In the case of *The Silvia*, 171 U.S. 462, 464, 19 S.Ct. 7, 43 L.Ed. 241 (1898), the Supreme Court announced that "[t]he test of seaworthiness is whether the vessel is reasonably fit to carry the cargo which she has undertaken to transport." *Atlantic Banana Co. v. M/V "Calanca"*, 342 F.Supp. 447, 452 (S.D.N.Y.1972). This commonly accepted definition of seaworthiness was later explained in *The Southwark*, 191 U.S. 1, 9, 24 S.Ct. 1, 3, 48 L.Ed. 65 (1903):

> "[S]eaworthiness is not an absolute but a relative term. It is to be considered in relation to the voyage undertaken, the cargo to be carried, and its stowage. Unless a vessel is reasonably fit to carry the cargo she has undertaken to transport, she is unseaworthy, but seaworthiness does not require perfection in a vessel."

Thus, a ship may be found seaworthy for lighterage but perhaps not fit for an ocean voyage, for lumber carriage but not for grain carriage, for summer travel but not for winter travel. *The Sagamore*, 300 F. 701 (2d Cir.1924). Any doubt as to the seaworthiness of the vessel "must be resolved against the ship owner and in favor of the shipper." *The Southwark*, 191 U.S. at 15, 24 S.Ct. at 6.

In an effort to establish the exercise of due diligence to render the CHERRY LAJU seaworthy, defendants introduced the testimony of naval architect Philip Kimball and Captains Edward P. Boyle and Scott Sammis of the National Cargo Bureau. These witnesses responded to plaintiff's claim that the CHERRY LAJU was rendered unseaworthy by her instability/improper stowage, unusable sailing directions, and broken fathometer. The Court finds that defendants failed to prove that they exercised the requisite diligence to make the CHERRY LAJU seaworthy.

*Instability/Improper Stowage*

■ Defendants failed to prove that the CHERRY LAJU complied with accepted safety rules for the carriage of bulk grain. The duty to make a vessel seaworthy requires that a vessel be safely loaded and properly stowed. *The Nidarholm*, 282 U.S. 681, 685, 51 S.Ct. 266, 268, 75 L.Ed. 614 (1931). "The law imposes upon owners of ships the duty of using due care to ascertain and consider the nature and characteristics of goods offered for

shipment...." *The Poleric [Bank Line v. Porter]*, 25 F.2d 843, 845 (4th Cir.1928). Section 1 of the Harter Act, 46 U.S.C. § 190, voids any provision in a bill of lading that attempts to relieve a carrier "from liability for loss or damage arising from negligence, fault, or failure in proper loading [or] stowage."

The rules and regulations of the National Cargo Bureau and SOLAS provide a measure of proper stowage. Even if these safety guidelines are not officially enforced as against vessels and voyages such as the CHERRY LAJU and her trip to Chalna, the Court must determine if the failure to abide by them was so dangerous or unreasonable under the circumstances as to be unacceptable. *The Silversandal [Bache v. Silver Line]*, 110 F.2d 60, 62 (2d Cir.1940).

At trial, the National Cargo Bureau's current president, Captain Sammis, testified that he had participated in the drafting of the 1974 SOLAS requirements for grain carriage. Under these rules, a ship like the CHERRY LAJU was required to have shifting boards, to strap or lash down cargo in partly filled compartments such as the first hold, and to maintain throughout the voyage a minimum metacentric height ("GM"). Mr. Kimball testified that the SOLAS stability formula required the CHERRY LAJU to maintain a GM of 3.7 feet. (Kimball, Tr. 278; Ex. 23, 27, 27A, 33). Both he and Captain Boyle, Chief Deputy Surveyor of the National Cargo Bureau, conceded that the CHERRY LAJU's GM was well below that figure. The CHERRY LAJU had neither boards nor minimal stability and thereby exposed the cargo to undue risks.

Both Captain Sammis and Captain Boyle stated that the SOLAS regulations were not necessarily applicable to the CHERRY LAJU because she was engaged in a coastwise voyage and not an international voyage. (Sammis, Tr. 301; Ex. CC). However, Captain Boyle testified that during his career at sea he had never carried grain without shifting boards. (Tr. 272). He also testified that if the CHERRY LAJU had complied with the SOLAS regulations, the casualty would have have occurred. (Tr. 212). The Bangladesh Committee of Enquiry clearly considered the SOLAS guidelines applicable to the CHERRY LAJU. (Ex. 17). Similarly, plaintiff's witness, Captain Rajnikant Jadhav, a master experienced in the carriage of grain and familiar with the Bay of Bengal, testified that in such bad weather, typical of the monsoon season, he would never have made the voyage without equipping the grain holds with shifting boards and calculating the GM. (Tr. 323–324).

Notwithstanding the SOLAS stability requirements, an experienced seaman should have realized that the ship's GM was dangerously low. Ms. Kimball calculated it to range between 1.47 and 1.61 feet at the time the CHERRY LAJU broke ground, finally settling on the figure 1.49 feet. (Tr. 147–153, 186–188). Although he also testified that such a GM was "sufficient," the Court concludes from general maritime usage that such a low GM was not sufficient and rendered the CHERRY LAJU unseaworthy for the carriage of grain during the monsoon season. By ignoring the GM guidelines, the CHERRY LAJU failed to comport with the settled principle that a vessel must be able to withstand expectable action of the seas and expectable vicissitudes. *The Cypria [Ore Steamship Corp. v. D/S A/S Hasse]*, 137 F.2d 326 (2d Cir.1943).

Similarly, defendants have not met their burden of proving that the vessel was seaworthy in the absence of shifting boards or greater diligence in stowing and securing the cargo. It is clear that both Captain Sobhan and Captain Guerrero were familiar with the expectable weather and sea conditions at the time of the 200 mile voyage and the evidence is clear that under these circumstances the failure to protect stowed grain from shifting rendered the vessel unseaworthy.

*Broken Fathometer/Unusable Sailing Directions*

Plaintiff argues that the lack of an operational fathometer aboard the CHERRY LAJU deprived her master and officers of the knowledge that the vessel had no clearance at all and thereby rendered her unseaworthy. Defendants respond that

the presence or absence of a fathometer does not determine seaworthiness. They claim that a fathometer would be useful to warn a vessel that it was entering shallow water when it did not intend to do so, but that it would not be helpful once a ship reached shallow water in which the ship intended to navigate. Defendants' witness Captain Boyle testified that the depth soundings recorded by a fathometer are used primarily to compare with those noted on depth charts and thereby pinpoint the ship's location: "It is not a grounding avoiding device. It is a navigational device when you're coming in and you have the gradient at the bottom. It is one more confirmation of where you are." (Boyle, Tr. 255–257). Defendants claim that the absence of a functional fathometer will not render a vessel unseaworthy when the vessel has other equipment which will fix her position.

Plaintiff relies on the testimony of defendants' own witnesses in its assertion that a working fathometer is imperative to a ship's seaworthiness. Captain Ostromogilisky testified that a fathometer is required for American flag vessels in the CHERRY LAJU's class. (Tr. 63). Captain Boyle testified that amendments to the 1974 SOLAS convention, which went into effect September 1, 1984, shortly after the sinking of the CHERRY LAJU, require a fathometer on board ships such as the CHERRY LAJU. (Tr. 257–258). Plaintiff's witness Captain Jadhav explained that aside from fixing a ship's position, a fathometer would assist when there is a risk of grounding because "it also gives you an idea as to whether your depth is increasing or decreasing as you go along the depth of water under your keel and as you're going along when you start realizing that it is decreasing to an extent where it becomes dangerous...." (Tr. 310–311).

The Court is guided by the rule that a vessel must be supplied with the means by which she may be safely navigated. *The Southwark*, 191 U.S. at 8–9, 24 S.Ct. at 3. She must "have on board a reliable compass or compasses, sextants and sounding apparatus" and be "equipped with adequate charts, light books, pilot books, lists of radio beacons, and notices to mariners." 2A *Benedict on Admiralty* § 67. The case law is mixed as to whether a fathometer is required. Compare *Hurst v. City of Virginia Beach*, 1972 A.M.C. 2346 (E.D.Va. 1971), with *Indian Towing Co. v. United States*, 182 F.Supp. 264, 270 (E.D.La.1959).

Over fifty years ago, when radios were not required on harbor tugs and were infrequently supplied, Judge Learned Hand addressed the issue of whether they nevertheless are a condition of seaworthiness. *The T.J. Hooper*, 60 F.2d 737, 740 (2d Cir.1932). He stated that

"in most cases reasonable prudence is in fact common prudence; but strictly it is never its measure; a whole calling may have unduly lagged in the adoption of new and available devices. It never may set its own tests, however persuasive be its usages. Courts must in the end say what is required; there are precautions so imperative that even their universal disregard will not excuse their omission."

Judge Hand concluded that, even though "there was no custom at all as to receiving sets," failure to supply tugs with them constituted unseaworthiness. Regardless of whether Judge Hand's decision was correct at the time it was uttered, in the instant case there does appear to exist a custom favoring the use of fathometers. At the time of the sinking of the CHERRY LAJU, it was believed "prudent" to have one on board. (Boyle, Tr. 258). However, this custom does not necessarily dictate the seaworthiness of the CHERRY LAJU for the lighterage voyage she undertook in this case.

Under different circumstances, on a longer voyage, in a larger ship a fathometer might be deemed imperative. Here, the CHERRY LAJU was able to fix her position absent a working fathometer because of the presence of direction finders, compasses, navigational charts, radio bearings, and radar. (Boyle, Tr. 255). And the testimony is uniform that a fathometer is neither the ordinary means for determining depth, nor the most accurate, especially as it does not operate efficiently in very shallow water. The absence of a working fath-

ometer under the facts in this case and standing alone, probably did not render the vessel unseaworthy.

 Nor did the presence of unreadable sailing directions render the CHERRY LAJU unseaworthy. It is true that the sailing directions, if readable, would have informed Captain Guerrero that he should not attempt to cross the Chalna bar in a southwest monsoon unless he had at least four feet of water under the keel. However, according to the CHERRY LAJU's navigational and depth charts, at least that much of a margin was available to her. The Bangladesh Anticipated Drafts Chart (Ex. GG) indicated a tide of 29 feet 9 inches and the CHERRY LAJU's draft was 24 feet 6 inches. Under the circumstances of this case, a lighterage voyage in the Ganges River Delta, the instructions of the port's pilot would take precedence over any other sailing directions and thus, the absence of readable sailing directions standing alone, probably did not constitute unseaworthiness. However, as noted earlier, the CHERRY LAJU was unseaworthy due to her instability and improper stowage of cargo at the start of the voyage.

 Because defendants have not established the seaworthiness of their vessel, the CHERRY LAJU, for the voyage she undertook in this case, they cannot avail themselves of the exceptions to liability under the Harter Act. They would rely on the Harter Act's exception for the damage or loss resulting from faults or errors in navigation or management of the vessel. 46 U.S.C.App. § 192. They blame the incident on the master's negligence and on the Bangladesh port authority's wrongful enticement of the CHERRY LAJU into a channel it should have known she could not navigate. However, in an Harter Act case, the faulty navigation exception is not available to unseaworthy vessels, regardless of whether the unseaworthy condition is related to the damage or loss. *The Isis*, 290 U.S. at 351, 54 S.Ct. at 167. Even if proof of a causal link were required, the unseaworthy condition in this case, the improper stowage of the cargo and the instability of

the CHERRY LAJU, did proximately contribute to the loss.

Defendants are liable to the United States for the cost of the lost and damaged grain in the amount of $1,144,388.77, based on local market price of $163 per metric ton. Plaintiff also seeks return of freight for the lost cargo and the fee it paid for the survey of the CHERRY LAJU. These claims, made for the first time in plaintiff's post-trial memoranda, are not properly included as items of damages. Plaintiff admits that the survey would have been performed regardless of the loss of the CHERRY LAJU. (Tr. 40). Moreover, there is nothing in the record to support a claim for freight, which in any case, is inconsistent with plaintiff's theory of recovery. Freight on the cargo transported by the S.S. ULTRAMAR was earned upon "arrival" at its destination. 7 C.F.R. 17.9 and 3. Plaintiff clearly argues and the Court has found that the S.S. ULTRAMAR "arrived" and discharged into the CHERRY LAJU, and freight was earned at that point in time, before the capsizing and sinking of the lighter.

Settle an appropriate judgment on five (5) days notice.

## SUPPLEMENTAL FINDINGS AND CONCLUSIONS

 The defendants have moved pursuant to Fed.R.Civ.P. 52 and 59 for an amendment of the Court's Findings and Conclusions issued on September 1, 1987. The defendants ask the Court to amend its findings of fact in relation to the testimony of Captain Boyle, and to virtually retry the case on a new theory. The defendants now claim that the contract between the parties was a private one, and therefore, the Harter Act does not apply. The Court heard oral arguments on the motion on November 23, 1987, and at that time determined to adhere to its initial factual findings regarding the testimony of Captain Boyle, and its conclusion that the improper stowage of the grain did proximately contribute to the loss. The Court now considers the issue of whether the contract between the parties was one for private carriage.

In *Koppers Connecticut Coke Co. v. James McWilliams Blue Line, Inc.*, 89 F.2d 865 (2d Cir.1937), our Court of Appeals held that the Harter Act did not apply to contracts of private carriage. The court reviewed the history of the Harter Act, and determined that its purpose was to remedy abuses which had arisen through the efforts of shipowners engaged in common carriage to limit unreasonably their obligations as carriers of goods. *Id.* at 866. The court stated that private carriers were left free to contract as they choose. *Id.* (citing *The Westmoreland*, 86 F.2d 96, 97 (2d Cir.1936)). Therefore, if this Court determined that the contract was one of private carriage, then the Harter Act would not apply *ex propio vigore*.

It is accepted law in this circuit that if there is cargo of two or more shippers on one vessel in one voyage, then the vessel is a common carrier. *See, e.g., The Ella Pierce Thurlow*, 300 F. 103 (S.D.N.Y.1921); *J. Gerber & Co. v. S.S. Sabine Howaldt*, 310 F.Supp. 343, 350 (S.D.N.Y.1969), revd. on other grounds, 437 F.2d 580 (2d Cir. 1971). It does not necessarily follow, however, that a vessel is a private carrier because it actually carries the cargo of only one shipper. For example, a common carrier may book only a partial load, and be unable to contract with other shippers to fill the rest of the ship. This fortuitous event would not convert the contract negotiated with the original shipper to one for private carriage.

This Court finds and concludes that the contract between the parties in this case is one of common carriage. The Court's original findings and conclusions indicated that the contract was formed by the Contract of Affreightment and the three bills of lading. The bills of lading contain the statement: "THIS CARGO MUST NOT BE STORED IN ANY HOLD THAT IS BEING USED TO CARRY INSECTICIDES OR OTHER TOXIC SUBSTANCES." This condition, negotiated by the parties and typed into the form by them, indicates that they did not contract for the full reach of the vessel, and anticipated that other cargo might be transported by the vessel on the same voyage. The contract by its terms, therefore, is one for common carriage.

The motion is denied.

SO ORDERED.